[No. 28444. Department Two. May 13, 1942.]

CHRYSTAL MILLER, *as Administratrix, Respondent,* v. H. M. ASBURY *et al., Appellants.*[1]

[1]Reported in 125 P. (2d) 652.

534

*Shank, Belt, Rode & Cook,* for appellants.

*Forest & Forest, Bonsted & Nichoson,* and *F. C. Palmer, Jr.,* for respondent.

ROBINSON, C. J.—This action arose out of an automobile collision at the intersection of Fort Simcoe road and Lateral "A" highway, seven miles west of Toppenish. The driver of one of the cars, Albert Miller, twenty-three years of age, received injuries from which he died. His widow recovered a verdict for $1,713.45.

The Asburys appeal, contending that the court erred in refusing to grant their motion for judgment notwithstanding the verdict.

Fort Simcoe road is a black top arterial highway, surfaced twenty feet in width, extending in an easterly and westerly direction. Lateral "A" highway is graveled, twenty feet in width, and extends in a northerly and southerly direction, intersecting the Fort Simcoe road at right angles. The intersection is wholly unobstructed by buildings, bushes, or other objects. Near the southeast corner of the intersection, thirty feet from the south edge of the black top, is a stop sign.

On July 20, 1940, appellant Asbury was driving east on the Fort Simcoe road and approaching the intersection. Miller, with a companion, Albert Messe, was driving north on Lateral "A", approaching the same intersection. The two cars came into collision. The point of impact, according to the testimony most favorable to respondent, was several feet north and east of the exact center of the intersection. Miller's car was struck on the left-hand side near the middle, made-

three complete turns, and came to rest in a ditch on the right-hand side of Lateral "A" highway, forty-five feet north of the point of impact. Asbury's car made one and one-half turns and came to rest on the south side of the Fort Simcoe road, one hundred and five feet east of the point of impact.

Messe was the principal witness for respondent. He had lived with Miller's mother and stepfather for eight years. Miller and Messe had worked together a great deal of that period, and at the moment were returning from a threshing job.

Officer Tull, of the state patrol, testified that, on the night of the accident, Messe told him, at the hospital, that they approached the intersection at a speed of eight miles per hour. A month less one day after that, Messe made a statement in the state patrol office, which was reduced to writing and signed by him, he swearing before a notary:

"That I have read the foregoing statement and believe it to be a true and impartial statement of facts."

The statement is in evidence as Exhibit "14", and reads, in part, as follows:

"I rode with Albert and he was driving his 1937 Ford V-8, I don't know the license number, and we started for home at Wapato. We both live at the Bartell home. We were driving north on the Lateral A road at a speed of perhaps 35 m.p.h. as that is his usual speed. I have ridden with him for the past seven years. The sky was cloudy but it was not storming.

"As we approached the Fort Road I noticed a car coming from the west, going east, on the Fort Road at least 70 m.p.h. At any rate it was a high rate of speed. As we approached the intersection Miller slowed the car to about four or five miles an hour in my judgment. He didn't come to a complete stop. He turned his head to the west so he must have seen the car coming. I thought he saw the car coming as he turned his head that way so I didn't say anything. I

thought he would stop and wait until the car went by. The last thing I noticed, just a fraction of a second before we were hit, I noticed the back of our car was past the middle of the intersection and then I don't remember anything.

"The above statement which I have given as near as I can remember is in substance the same as I told Officer Tull at Bozarth Nursing Home the night of the accident at about two hours after the accident. This is a true statement. Since talking to Officer Tull the night of the accident I have a statement to Mr. Forrest, attorney from Yakima, and in the statement I have to Mr. Forrest I stated that Mr. Miller came to a complete stop. I wish to state here now, and incorporate as a part of this statement, that my statement to Mr. Forrest with regard to Mr. Miller's stopping was untrue."

At the trial, Messe reiterated that he had falsely stated to Mr. Forest, one of respondent's counsel, that Miller had come to a complete stop before entering the arterial. He also testified that, when he signed the affidavit stating that Miller slowed down to "four or five miles an hour," he was nervous, and that, in fact, Miller slowed down to "one to three miles an hour." To this estimate he clung firmly through a searching cross-examination, and this will be considered his evidence on that point in our consideration of the question presented for decision.

Messe further testified that, as the front wheels of their car arrived at the south edge of the black top, it was proceeding at from three to four miles per hour, and that, at that instant, when its front wheels were just starting to go on the black top, he saw the Asbury car, abreast of a road sign, coming toward them at, at least, seventy miles per hour. This sign was, by actual measurement, three hundred and fifteen feet from the intersection. He had stated in the affidavit that, at the moment of impact, the Miller car was past the middle

of the intersection. At the trial, he testified that the rear two feet of it were still south of the center line of the fort road.

After the respondent's case was in, Fred Wright, an eyewitness of the accident, was discovered by her attorneys, and, upon their motion, the respondent's case was reopened and his testimony taken. Wright testified that he was working in a field about an eighth of a mile from the scene of the accident, and that the Asbury car approached the intersection at seventy-five miles per hour; that he first saw it when it was opposite a small shack which proved, upon measurement, to be two hundred feet from the intersection. He described the movement of the Miller car, as follows:

"Well, it seemed like he had slowed down before he got to the intersection, and he entered the intersection and he was kind of—after he entered there he kind of seemed to be speeding up a little to get across. He was going slow when I seen him; he was going probably five miles an hour."

Appellant Asbury testified that he was driving but thirty-five miles per hour on the arterial highway, and that, when he was from eighteen to twenty-five feet from the intersection, Miller was from five to eight feet south of it, going at about the same rate of speed.

The motor vehicle act (Laws of 1937, chapter 189, p. 899, § 90, Rem. Rev. Stat., Vol. 7A, § 6360-90 [P. C. § 2696-848]) reads as follows:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped shall look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection."

Considering this statute, with the above evidence in mind, and giving the respondent, as we must

after a verdict in her favor, the benefit of every favorable inference to be drawn from the evidence, we are compelled to arrive at the following conclusions: (1) That the jury was entitled to find that the appellant was driving upon the arterial highway at the negligent and unlawful speed of seventy or seventy-five miles per hour; (2) that the presumption that Miller was taking due care for his own safety was completely overcome by the testimony of Messe and Wright; (3) that, according to the undisputed evidence, in approaching the arterial, Miller violated the statutory requirement to stop his car at the entrance to the intersection of an arterial highway; (4) that, according to the undisputed evidence, when he reached the surfaced portion of the highway, he was traveling but three or four miles per hour, and an automobile was then in plain sight at a distance of but three hundred and fifteen feet, simultaneously approaching a given point in the intersection, and, according to the evidence submitted on behalf of respondent, at a speed of from seventy to seventy-five miles per hour; yet, instead of yielding the right of way, as commanded by the statute, he speeded up and attempted to cross in front of it at a speed of from three to five miles per hour, although the automobile was approaching at 102.66 feet per second, and would, therefore, reach the intersection in 3.06 seconds.

It may well be doubted, considering the matter from the common-law point of view only, whether reasonable minds could arrive at the conclusion that one who took such a chance was acting with due regard for his own safety. But it is unnecessary to pass upon the common-law aspect of the matter, since Miller was so clearly guilty of negligence *per se*, first, in failing to stop at the entrance to the intersection, and, then, in

failing to give the right of way to the car rapidly approaching on the arterial highway, which he might easily have done at any time while traversing the thirty feet between the stop sign and the traveled portion of the highway.

The purpose of the statute is to prevent just such accidents as that described by the evidence in this case. Arterial highways carry fast moving traffic. Numerous accidents will occur unless such highways are entered with care. The legislative policy and purpose are not to permit an operator of a vehicle approaching an arterial, as distinguished from an ordinary, highway, to speculate as to whether he may safely drive into it without stopping. It provides that he shall stop and make certain preliminary observations. The statute is mandatory. It says he *"shall stop as required by law."* An interval is thus forced upon him, a period during which he is entirely free from the task of operating his own vehicle, and he is told exactly what he must do during that interval, and in equally mandatory language—*"and having stopped shall look out for and give right of way to any vehicles upon such arterial. . . . "* (Italics ours.)

Furthermore, the statute, by requiring a stop at the entrance to the intersection, insures the vehicle's arrival at the traveled portion of the arterial at such a slow rate of speed that, even if its operator has for some reason previously failed to detect a car approaching on the arterial, he can still obey the other mandate of the statute and "give right of way." In brief, the mandatory commands of the statute to the operator of a vehicle about to enter an arterial are: Stop and give your entire attention to looking for traffic on the arterial, and if you see a vehicle thereon about to cross the same point which you are about to cross, give it the right

of way. If these commands of the statute are obeyed, it is very difficult to imagine how an accident of the kind with which we are now dealing can occur, especially at an unobstructed crossing.

(It may be noted in passing that the legislature appears to regard arterial highway crossings as even more dangerous than railroad crossings; for, while another section of the same act (Laws of 1937, chapter 189, p. 905, § 104; Rem. Rev. Stat., Vol. 7A, § 6360-104 [P. C. § 2696-862]) provides that carriers of passengers for hire, school busses, and vehicles transporting explosives or inflammable liquids shall stop at railroad crossings, all other vehicles are permitted merely to reduce speed to a point where they can be brought to a complete stop not less than ten feet from the nearest track.)

It appearing from the undisputed evidence that Miller was guilty of negligence *per se,* first, in failing to stop, and, second, in refusing to give the car on the arterial the right of way, was there any evidence tending to prove that his negligence was not a contributing cause of the accident? The result of the appeal turns upon the answer to this question. Unfortunately for the respondent, all of the evidence points in the other direction. Obviously, the stopping and starting of an automobile must consume an appreciable amount of time. Had Miller brought his car to a stop at the entrance to the intersection, by the time he started again and reached the traveled portion of the roadway, the appellants' car, traveling at 102.66 feet per second, would, in all probability, have been already past, or at least already in, the intersection, instead of three hundred and fifteen feet away. Beyond the shadow of a doubt, it would, at least, have been so close to the intersection that no sane man, in the exercise of any care

whatever for his own safety, would have attempted to cross in front of it.

Furthermore, there is no evidence which tends to excuse him from failing to yield the right of way. Instead of doing so, he entered the traveled portion of the arterial at the rate of three or four miles per hour in the path of appellants' car which, according to the only evidence on the point, was then but three hundred and fifteen feet distant, in space, and but 3.06 seconds, in time, and traveling at an admitted speed of from seventeen to twenty-three times that of his own. Had he, in obedience to the statute, yielded the right of way, there would have been no collision. His negligence in that respect was a second contributory cause.

There being no evidence whatever tending to show that his failure to obey the statute was not a contributing cause of Miller's injury and subsequent death, no jury question was presented. The trial court, therefore, erred in refusing to enter judgment for the defendants notwithstanding the verdict of the jury.

The judgment appealed from is reversed and the action ordered dismissed.

BEALS, SIMPSON, and JEFFERS, JJ., concur.

BLAKE, J. (dissenting)—Under the facts and circumstances surrounding the collision, I think it was for the jury to say whether Miller's failure to come to a "dead stop" was a contributing cause of the accident.