Argued September 30; reversed February 10, 1948

# CAMERON *v.* GOREE

189 P. (2d) 596

584

CAMERON, *Respondent, v.* GOREE, *Appellant.*

*William E. Dougherty,* of Portland, argued the cause for appellant. With him on the brief were Maguire, Shields and Morrison, of Portland.

*John Gordon Gearin,* of Portland, argued the cause for respondent. With him on the brief were Koerner, Young, Swett and McColloch, of Portland.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and HAY, Justices.

ROSSMAN, C. J.

This is an appeal by the defendant from a judgment of the circuit court, in favor of the plaintiff, which was entered in an action brought to recover damages for personal injuries the plaintiff sustained when an automobile in which she was riding as a guest collided with one operated by the appellant.

The appellant submits six assignments of error. The first challenges a ruling which denied his motion for a nonsuit. The second, third, fourth and fifth are based upon instructions given to the jury, and the sixth attacks a ruling which received testimony over the appellant's objections.

We shall now consider the first assignment of error. The collision occurred at noon April 8, 1945, at the intersection of Hogan and Palmquist Roads, a few miles east of Portland. April 8 was a clear day and the pavement was dry. Palmquist Road, an arterial way, runs east and west. Hogan Road, a lateral, lies north and south. The width of the pavement of Palmquist and Hogan is, respectively 24 and 22 feet wide. The over-all width of the two thoroughfares is not disclosed by the record, but it is apparent from the evidence that Palmquist Road has broad graveled shoulders.

The appellant was driving east on Palmquist Road, and the car in which the respondent was riding was going north on Hogan. It was operated by her brother, Joseph LaValley. Each driver intended to continue straight ahead. A stop sign faced Mr. LaValley 20 or 25 feet south of the intersection as he approached it. He did not stop.

As we have indicated, the appellant's car approached the intersection from the left of Mr. LaValley. The area in the vicinity of the intersection was open country, but shrubbery covered the property at the southwest corner and rendered it impossible for motorists to look through the corner. No cars were in sight at the time of the accident except those of the appellant and Mr. LaValley.

We shall now quote from the testimony given by

Mr. LaValley, who testified for the respondent, his sister. This testimony, in addition to describing the intersection and the obstructing foliage, gives impressions concerning the shoulders along Palmquist Road. The width of the latter, whatever it may be, plus the width of the pavement (24 feet), very likely shows the over-all width of Palmquist Road. Mr. LaValley's testimony is virtually the only information before us concerning those details.

"Q. About how, if you know, were those shrubs from the south side of Palmquist? Do you understand me now?

"A. Yes. They was fairly close. I believe there is a hawthorne between the curbline and the evergreens.

"Q. You say it is pretty close. Can you tell in feet how close it was?

"A. Well, between 10 and 15 feet, I imagine.

"Q. That is what, the hawthorne or the —

"A. No the evergreens.

"Q. Between the evergreens and the south curb of Palmquist was there anything else in between there?

"A. Yes, that hawthorne bush and a telephone pole.

"Q. Was there anything along the south curbline of Palmquist to your left besides the telephone pole, the hawthorne bush and the evergreens?

"A. Not that I remember.

"Q. And where is the telephone pole with relation to the south side of Palmquist?

"A. Well, it is right on the curbline and the hawthorne bush is right up close to it, just about touching it.

"Q. What distance, if any, is there between the evergreens and the hawthorne?

"A. Well, I believe the branches touch each other.

"Q. So that, in other words, there is obstruction all the way up to the corner?

"A. Yes."

Further referring to the evergreens, the witness was asked, and answered, as follows:

"Q. Where would you have to be on Hogan, Mr. LaValley, to be able to see a car coming on Palmquist?

"A. Well, the front of your car has to be entering the intersection.

"Q. And when you say 'entering', can that be just before, or can you elaborate on that a little bit?

"A. Well, where you are sitting in the car you have to be up just about the curbline.

"Q. In other words, you yourself as driver have to be up there; is that correct?

"A. Yes.

"Q. And in your car about how far do you sit from the front bumper?

"A. Oh, I imagine around eight feet.

"Q. So that in order for you, the driver, to get a look as to what is coming along Palmquist, the front end of your car must be some eight feet out in the intersection; is that right?

"A. Yes.

\* \* \*

"Q. And where were you with relation to the curbline of Palmquist when you saw Mr. Goree's car?

"A. I was — — I believe I was right at the curbline.

\* \* \*

"Q. What is your best judgment on that on the distance it is from the highway?

"A. You mean the evergreens?

"Q. Yes.

"A. Well, I believe it would be about 10, 15 feet.

\* \* \*

"Q. And you have to get out in front of this shrubbery before you get a view up the highway?

"A. You have to get out further than the evergreens because of the hawthorne bush there."

From the foregoing it appears that (1) the 24-foot-wide pavement along Palmquist was paralleled by shoulders which were possibly 10 or 15 feet wide; (2) property line of the south side of Palmquist was possibly 10 or 15 feet from the edge of the pavement; (3) the evergreens and foliage extended into the shoulder area; and (4) a driver on Hogan could not see a car on Palmquist left of the intersection until the seat of his car was upon the line representing the south curbline of Palmquist.

Mr. LaValley admitted that he did not stop before entering the intersection and undertaking to cross Palmquist. He swore that at the stop sign he shifted into second gear and entered the intersection "about 12 to 15 miles per hour." When his car "was right at the curbline" of Palmquist he saw, so he testified, the appellant's car which was straddling the center line of the road. He claimed that he was unable to see it sooner because of the shrubbery. He was sure that the appellant's car was then 170 feet distant and explained that when he first saw it, it was opposite a driveway, which he later ascertained by taking measurement to be 170 feet from the center of the intersection. Upon observing the appellant's car, he "put the throttle way down and tried to get out of the way." He thought that his car traveled no more than 8 or 10 feet and that "just a few seconds" elapsed from the instant the appellant's car came into view until he was hit. The collision occurred a foot northeast of the center of the intersection. The LaValley car was struck in its left door. The impact carried

the cars 40 feet northeasterly into a ditch at the north edge of Palmquist. The LaValley car was demolished.

Mr. LaValley's wife, who sat alongside him, did not realize until their car had passed the stop sign that her husband did not intend to stop. She then glanced to her left, saw the appellant's car, which was "awfully close" and noticed it was "going fast." "Only a second" later, according to her, the collision occurred. The respondent was rendered unconscious by the accident and was unable to give any testimony concerning it.

The appellant, called as a witness by the respondent, testified that he "was going between 30 and 35 miles an hour" as he approached the intersection. He added that he was "15, 20 feet, something like that," from the intersection when he saw the car driven by LaValley about 15 to 25 feet south of the intersection. It "flashed past the stop sign," so he swore, at a speed of 30 to 35 miles an hour. Continuing, he averred:

"I didn't think he had a chance in the world to stop at the speed he was going."

We quote further from his testimony:

"Q. How fast was Mr. LaValley going when you first saw him?

"A. I should judge he was going about the same distance or speed that I was.

"Q. He was going about 30 or 35 miles an hour?

"A. Yes, sir."

The appellant swore that he applied the brakes, which were in good condition, the moment that the LaValley car came into view, but that the distance was too short to enable him to stop.

We quote the following from Mr. LaValley's testimony:

"Q. Now, Joe, I will ask you if it is not a fact that after the accident, when Police Sergeant Givens arrived to investigate the accident, that you advised the police officer that you entered the intersection at approximately 30 miles an hour and did not stop?

"A. I couldn't say.

"Q. You won't deny telling him that, do you?

"A. No. I know I talked to him but I don't know what I said.

"Q. I will ask you if you did not tell the police officer that you estimated the speed of the Goree car, of Mr. Goree's car, at 25 to 30 miles an hour? Do you recall giving the police officer that information?

"A. No, I don't.

"Q. But you don't deny it? You had a conversation with him but you don't deny telling him that, do you?

"A. That is right."

■ Mr. LaValley was asked to state how fast the appellant's car was traveling. An objection made by the appellant was sustained, very likely in reliance upon *Nyhart v. Oregon Stages, Inc.,* 126 Or. 105, 268 P. 982. However, since the trial of the instant case, the Nyhart decision was overruled by *Snyder v. Portland Traction Co.,* (Or.), 185 P. 2d 563. The answer, therefore, should have been received. Respondent's counsel made an offer of proof in which he stated that if Mr. LaValley were permitted to testify he would say that the appellant's car was traveling 50 miles an hour.

After the foregoing testimony had been given and the offer of proof had been made, the motion for a nonsuit was presented.

In support of his contention that error was com-

mitted when his motion for a nonsuit was denied, the appellant says:

"The evidence affirmatively shows that the sole proximate cause of the accident was the admitted negligence of the driver of the car plaintiff occupied in entering the arterial highway from the concealed side road without stopping. \* \* \* There was no satisfactory evidence that defendant was driving at an unreasonable or imprudent speed."

The respondent states:

"Had he (her brother) stopped where the law required him to stop he could not have seen to his left or in the direction from which the appellant was approaching \* \* \*. When the front of the LaValley automobile was in the intersection, appellant's automobile was approximately 170 feet away and approaching at a high rate of speed. Before LaValley could get his automobile out of the way the collision occurred. \* \* \* Appellant's automobile traveled approximately 170 feet within a few seconds. It struck the LaValley automobile and knocked it 40 feet eastward into a ditch and up against a bank. Surely here is evidence of excessive speed."

It is evident from the foregoing excerpts, which we took from the parties' briefs, that (1) the appellant, in support of the present assignment of error, contends that the evidence affirmatively shows that the proximate cause of respondent's injury was the failure of the car she occupied to stop before it entered Palmquist Road; and (2) the respondent insists that the evidence shows that (a) the appellant approached the intersection at a negligent rate of speed, and (b) the appellant's purported negligent speed was the proximate cause of the respondent's injury. The respondent also says that appellant's car was not under control, that the appellant failed to maintain a lookout and

likewise failed to exercise due care; but those three contentions are closely linked with a statement that "appellant was approximately 170 feet away when the LaValley car was in the intersection."

Section 115-351, O. C. L. A., as amended by 1941 Oregon Laws, chapter 428, § 10, says:

"The state highway commission with reference to state highways, and local authorities with reference to highways under their jurisdiction, hereby are authorized to designate main traveled or through highways by placing at the entrances thereto from intersecting highways signs or markers notifying drivers of vehicles to stop before entering or crossing such designated highways, * * * and whenever any such signs have been so placed it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto, * * *. Such signs and markers shall be placed as nearly as practicable and the stop shall be made at the place where such cross street meets the prolongation of the nearest property line of such through highway."

Section 115-311, O. C. L. A., says:

"It shall be unlawful for the driver of any vehicle * * * to disobey the instructions of any official traffic sign * * *."

Section 115-337, O. C. L. A., says:

"The driver of any vehicle who has stopped as required by law at the entrance to a through highway shall yield to the other vehicles within the intersection or approaching so closely on the through highway as to constitute an immediate hazard, but said driver having so yielded may proceed, and other vehicles approaching the intersection on the through highway shall yield to the vehicle so proceeding into or across the through highway."

As we have seen, the respondent agrues that if her brother had stopped "where the law required him to

stop'' he could not have seen the appellant's car. We have noticed that § 115-351, O. C. L. A., says:

"The stop shall be made at the place where such cross street meets the prolongation of the nearest property line of such through highway."

It is that provision upon which the respondent relies. She seems to interpret it as meaning that the car upon the cross street must stop when its front bumper reaches "the place where such cross street meets the prolongation * * *." The evidence does not indicate precisely the distance between the south edge of the pavement along Palmquist (where LaValley claims a motorist must be in order to gain a view to the left down Palmquist) and the line which constitutes, for one coming from the south, the nearest property line along Palmquist. As nearly as we can determine, the space between the south edge of the pavement and the south property line is 10 or 15 feet. If Mr. La-Valley's testimony reflects the truth and if a motorist who approaches this intersection from the south can not obtain an adequate view to the left along Palmquist until he has reached the south edge of the pavement, then a stop made at the property line 10 or 15 feet south of that point would be useless.

■ No doubt, the purposes of legislation which requires a driver on a secondary road to stop before entering an intersection are (1) to force him to get his car fully under control; (2) to afford him a better opportunity of making observations; (3) to afford him a better opportunity to hear; and (4) to afford the car on the trunk road a better view of him. Very likely another purpose is to give the driver on the lateral an impulse to stop again upon discovering something which threatens danger, for it is well known

that a driver who stops before he enters an intersection has an impulse to stop again upon sensing danger, whereas one who did no more than make "a rolling stop" feels an urge to accelerate when he encounters peril.

■ The purposes served by legislation such as § 115-351 do not demand that a motorist upon a cross street must determine with precision the place where the cross street meets the prolongation of the nearest property line of the through street and then stop exactly upon the line. Apparently substantial compliance with the requirement serves the purposes. In many instances it would be difficult, if not impossible, for a motorist approaching an intersection to locate the true line where the cross street meets the prolongation of the nearest property line. If he were compelled to find the exact line, traffic would be hindered and no useful purpose would be served. In innumerable instances a view attempted at the precise point suggested by the quoted language would be prevented by an obstructing object or building. If a car upon a lateral is required to stop upon the precise line, even though a view there is blocked by a parked car or other object, the obstruction, in addition to preventing the view, will conceal the stopped car from motorists upon the arterial way. A car has length, and the words above quoted do not indicate which part of it must be upon the extended property line. If the legislature intended that the motorist should stop upon the exact line, § 115-351 would have specified the part of the car which must be upon the line. The circumstances argue cogently that substantial observance is the most that the legislature intended to exact by the language upon which the respondent relies: *Olson v. Musselman*, 127 Conn. 288, 15 Atl. 2d 879.

■■ We think that in determining where the stop must be made, all parts of §§ 115-311, 115-337 and 115-351, O. C. L. A., previously quoted, must be considered. It will be recalled that § 115-351 says that the stop markers shall be notice to motorists "to stop before entering or crossing such designated highways." Section 115-337 gives us the ultimate purpose of the stop requirement. It states that after the stop has been made, the driver shall yield the right of way "to the other vehicles within the intersection or approaching so closely on the through highway as to constitute an immediate hazard." Obviously, yielding the right of way to cars with which a collision would otherwise occur is the chief objective of the stop requirement. A motorist upon a secondary way must, therefore, do three things: (1) stop, (2) look, and (3) yield the right of way to cars within the range of hazard. The third duty makes it manifest that the legislature intended that the stop must be made where an adequate view is obtainable. We are convinced that our traffic act means that drivers upon laterals must stop where they can see not only the cars in the intersection, but also those approaching upon the trunk highway. That construction, we are satisfied, is the same as contemporaneous use is daily placing upon the act. *Fish v. Southern Pacific Co.*, 173 Or. 294, 143 P. 2d 917, 145 P. 2d 991, which the respondent cites, was not affected by the statutes which control this action.

■ The admitted failure of Mr. LaValley to stop before he entered the intersection was negligence as a matter of law: *Frame v. Arrow Towing Service*, 155 Or. 522, 64 P. 2d 1312; *Buck v. Ice Delivery Co.*, 146 Or. 132, 29 P. 2d 523; and *Ramp v. Osborn*, 115 Or. 672, 239 P. 112. Before going on it is well to take notice

of the circumstances under which Mr. LaValley performed his negligent act. He swore that when he entered the intersection the appellant's car was 170 feet away. Although 170 feet is a substantial distance for one on foot, yet it is a short space for a rapidly moving automobile. The designated speed on Palmquist Road is 55 miles per hour; see § 115-320, O.C.L.A., as amended by 1941 Oregon Laws, chap. 458, § 1; and see *Mercer v. Risberg,* 182 Or. 526, 188 P. (2d) 632. From the foregoing, we see that Mr. LaValley emerged from a concealed place at a speed of 12 to 15 miles into a trunk highway where he must have known that cars might be approaching at a speed as high as 55 miles an hour. He must have known also that he was required to yield the right of way to every car to his left which constituted a traffic hazard. Four or five feet before his front bumper reached the center line of Palmquist he saw the appellant's car only 170 feet to his left. He realized that it was traveling at a high rate of speed and, although he had not stopped previously, he did not stop when he saw the approaching car. To the contrary, he accelerated his speed and thus got directly into the path of the appellant's car where he was struck.

■ The appellant makes no effort to impute Mr. LaValley's negligence to the respondent, and there is no contention that she was guilty of contributory negligence. If the conceded negligence of Mr. LaValley was the proximate cause of the respondent's injuries, she, of course, can not recover. That is merely another way of saying that if the appellant was not at fault he is not liable. However, if he was negligent and if his negligence and that of Mr. LaValley combined and became the proximate cause of the respond-

ent's injuries, the appellant is liable. No tort feasor is relieved from liability merely because his negligence was not the sole cause of an injury: Blashfield's Cyclopedia of Automobile Law and Practice, § 2551, and *Ross v. Willamette Valley Transfer Co.*, 119 Or. 395, 248 P. 1088.

As we have stated, the respondent claims that the appellant approached the intersection at a negligent rate of speed and that the latter was the proximate cause of her injuries. The items of evidence upon which she depends are: (1) Mrs. LaValley's testimony that the appellant's car "was going fast"; (2) the fact that the LaValley car was demolished by the force of the impact and that the cars were carried 40 feet before they came to rest; (3) Mr. LaValley's testimony that the appellant drove 170 feet while he went 8 or 10 feet at a rate of 12 to 15 miles per hour; (4) Mr. LaValley's testimony that the appellant went 170 feet in "just a few seconds"; and (5) the fact that Mr. LaValley's injuries confined him in a hospital for five weeks.

If Mr. LaValley used the term "a few seconds" literally when he testified that "just a few seconds" passed from the time he saw the appellant's car 170 feet away until the collision occurred, and if we assume that four seconds are "a few seconds," then, the appellant's speed was less than 40 miles per hour. The non-convincing character of deductions made in that way is illustrated by the deduction to be drawn from the fact that while the appellant drove the purported distance of 170 feet in a few seconds, Mr. LaValley drove only 8 or 10 feet with "the throttle way down." Surely "a few seconds" would not be consumed in traveling 8 or 10 feet by a driver whose

speed at the beginning was 12 miles per hour and who accelerated it as much as he could in second gear. Possibly Mr. LaValley used the expression "just a few seconds" as the equivalent of "an appreciable amount of time."

As just indicated, Mr. LaValley swore that when he first saw the appellant's car it was 170 feet from the center of the intersection. The crash occurred slightly to the northeast of the center. Mr. LaValley did not say that the distance between the two points was "about" or "approximately" 170 feet, nor did he say that he guessed or estimated the distance. According to his narrative, the appellant's car when first observed was opposite a driveway, and the distance from the driveway to the center of the intersection, when later measured, was found to be 170 feet. He estimated he was traveling about 12 to 15 miles per hour as he entered the intersection, and said that in order to reach the point of impact he had to go 8 or 10 feet.

If the appellant was 170 feet from the center of the intersection when Mr. LaValley was 8 feet from the same point, traveling 12 miles per hour, the appellant was going 255 miles per hour. If Mr. LaValley's speed was 15 miles per hour, the appellant's was 318 miles per hour. If Mr. LaValley traveled 10 feet at 12 miles per hour, the appellant's speed was 204 miles per hour; and if Mr. LaValley traveled 10 feet at 15 miles per hour, the appellant covered the 170 feet at 255 miles per hour. If, due to the fact that he had "the throttle way down," Mr. LaValley's speed became greater than 15 miles, the appellant's was more than 255 miles per hour.

The appellant's car was a 1941 Chevrolet. If it was traveling at a speed of 204 miles per hour it moved

299 feet per second and covered the distance of 170 feet, not in "just a few seconds" but in about one-half second of time. The road was level.

■■ Courts take judicial notice of facts which form part of the common knowledge of people who possess average intelligence. We think that people of average intelligence know that automobiles such as the one which the appellant drove can not travel 200 miles per hour.

■ *Van Zandt v. Goodman*, (Or.), 179 P. 2d 724, analyzed "the incontrovertible physical facts rule." The decision states:

> "It is, of course, the rule that a verdict or finding cannot be based on evidence which is opposed to establish physical facts."

When the facts to which a witness has given utterance are contrary to common experience and it is impossible that they can be true, they must be rejected. In order to reject such testimony, it is not necessary to find that the witness was of a mendacious type. If it is obvious that his testimony can not be true, it is rejected; the character and the motive of the witness are immaterial.

■ Since it is impossible that the appellant's car could travel at a rate of 204 miles per hour, either Mr. LaValley drove to the point of collision much slower than 12 to 15 miles per hour or the appellant was materially less than 170 feet from the intersection when the LaValley car entered it. We have no means of determining which of the alternatives is the correct one. In view of the fact that every deduction which can be drawn from the data given by Mr. LaValley attributes to the appellant's car a speed which is palpably im-

possible, we decline to use the data for the purpose of calculating speed. When counsel for the respondent made the offer of proof in which he said that Mr. LaValley, if permitted to testify upon the subject, would swear that the appellant's car was traveling 50 miles per hour, he thereby indicated that the appellant's speed could not be determined from the data supplied by the respondent's brother. We are satisfied that, in determining whether or not error was committed when the motion for a nonsuit was denied, the speed of the appellant can not be deduced from the figures submitted by Mr. LaValley. See *Wolf v. City Railway Co.*, 50 Or. 64, 85, P. 620, 91 P. 460.

We now turn to the contention that the force of the impact shows that the appellant's car was traveling at a negligent rate of speed when it ran into the car occupied by the respondent. Both cars were in motion when the crash occurred. The appellant swore that his speed was 30 to 35 miles per hour, and Mr. LaValley said that he entered the intersection in second gear at 12 to 15 miles per hour. The following testimony and some photographs afford us virtually all the information we have concerning the impact. Mr. LaValley testified that the front end of the appellant's car hit his on the left door. Then he was questioned as follows:

"Q. Was your car moved any by the impact?
"A. After the first hit was, you mean?

"Q. Yes.
"A. Yes.

"Q. In which direction was your car moved?
"A. It was moved to the northeast.

"Q. And about how far was it moved?
"A. About forty feet."

Thus, the force of the impact caused the LaValley car to veer to the right. The questioning continued:

"Q. And after the impact was there anyone left in your car?
"A. Just myself.
"Q. And where was your wife?
"A. She was out in the field.
"Q. About how far from the car?
"A. About eight or ten feet.
"Q. And where was your sister?
"A. She was underneath the car."

It will be recalled that before the accident the LaValley car was heading north and the appellant's east. The photographs show that before they came to rest both cars had passed out of the intersection and onto the north shoulder of Palmquist Road. The LaValley car faced west, 40 feet from the scene of the crash. While it was moving out of the intersection its rear swung around until the car had made a turn of 90 degrees. After the cars came to rest, the appellant's faced the LaValley car with its front touching the front of the other. Although the appellant's car struck the LaValley car in the left door, yet after the cars came to rest the appellant's was not adjacent to the door but was in front of that car.

Mr. LaValley swore that his car was totally demolished in the collision. Although the photographs may not show all of the effects of the impact, nevertheless, they indicate that the damage to the LaValley car was largely confined to (a) a shattering of its windshield; (b) a misalignment of its left front wheel, caused possibly by damage to the front axle; and (c) a denting and crushing in of its left side.

There is no evidence that either car made skid marks or was lifted off the pavement by the impact.

■ The nature and extent of the damage inflicted by a car, accused of a negligent rate of speed, through collision with another object or with a person may indicate that the alleged tortious car was going rapidly. If evidence concerning the damage has such tendency, it is admissible: *McVay v. Byars,* 171 Or. 449, 138 P. 2d 210; *Greenslitt v. Three Bros. Baking Co.,* 170 Or. 345, 133 P. 2d 597; *Goodale v. Hathaway,* 149 Or. 237, 39 P. 2d 678; and *Schairer v. Johnson,* 128 Or. 409, 272 P. 1027. In the Greenslitt case a truck struck and killed a pedestrian. The evidence showed that the truck hurled the pedestrian's body over the hood and cab of the truck. It also described the mangled condition of the deceased's body and the damages inflicted upon the truck. In the Schairer case the car of the alleged negligent driver struck a telephone pole. The decision says:

> "Nor can fault be found with the trial court for receiving into the record testimony relating to the wrecked and ruined condition of the defendant's automobile after the accident. The demolished car was a mute but effective witness tending to prove that the automobile struck the telephone pole with much force and great momentum."

The McVay and Goodale decisions were based upon automobile collisions. Manifestly, when two cars of about equal weight come into collision it is difficult to deduce from the damage the approximate speed of either. The McVay decision states:

"We cannot say" that excessive speed on the part of one of the cars could not be

> "deduced from the force of the collision, from the serious character of the injuries which plaintiff and one of the defendant's passengers received."

The Goodale decision says:

> "We think that evidence relative to the extent of damage to the car was entitled to go to the jury for what it was worth as to question of speed."

From *Whiting v. Andrus*, 173 Or. 133, 144 P. 2d 501, we quote:

> "Mr. Merrill's car was a Studebaker sedan, while the defendant's was a Ford coupe, and we do not believe that the mere fact that the lighter car bounced backward would justify a jury in finding that the heavier car was being driven at an excessive rate of speed."

In *Hamilton v. Finch*, 166 Or. 156, 109 P. 2d 852, 111 P. 2d 81, it is said:

> "It is sufficient to say, so far as this case is concerned, that it would be not a logical deduction, but mere guesswork, to infer that the defendant's automobile was driven at an unreasonable rate of speed from the facts shown respecting the plaintiff's injury. The plaintiff was not thrown any considerable distance by the force of the collision. The only evidence on that point is the defendant's testimony that 'he bounced back a few feet.' There is no evidence that he received any severe injuries in his fall to the pavement."

*Paul v. Drown*, 108 Vt. 458, 189 Atl. 144, 109 A. L. R. 1085, was based upon a collision of two automobiles. The defendant testified that the force of the impact drove his head and arm through the left window of his car, thereby injuring him. The plaintiff, on appeal, complained of the trial judge's ruling which permitted the defendant to give that testimony. We now quote from the affirming decision:

> "No error appears. The evidence had some bearing upon the force of the impact, and, consequently, upon the speed of the automobile in-

volved. See Healy, Admr., v. Moore, (Vt.), 187 Atl. 679, 685. Indeed, it appears to have been as favorable to the plaintiff as to the defendant, since there was evidence tending to show that the latter was driving at a high rate of speed.''

That decision illustrates the fact that evidence of damage may fail to identify the car which was traveling at a negligent speed.

The assignment of error under consideration is not concerned with the admissibility of evidence. All of the evidence upon which the respondent depends was admitted and is mentioned in the preceding review. The sole question is whether that evidence indicates that the appellant's car was proceeding at a negligent rate of speed when it struck the LaValley car. It is apparent that the blow inflicted by the appellant's car caused the damage to the left side of the LaValley car which we described. It likewise seems clear that the manner in which the appellant's car struck the left side of the LaValley car while the latter was traveling in second gear caused the LaValley car to pivot and consummate a 90-degree turn before coming to rest. It is evident that the blow which was delivered to the left side of the LaValley car forced open its right door and that the force of the blow, aided by the pivoting of the car, caused two of its occupants to fall out.

How the LaValley car made its 90-degree turn and got to its eventual resting place, we do not know. Seemingly, it was not shoved there by the appellant's car, for had it been shoved its tires would have left black marks upon the pavement. No witness mentioned tire marks. Whether or not it would have acted in the same way had it been standing still when it was hit, we do not know.

We think that it is permissible for us to infer that if a car proceeding along Palmquist Road at a lawful rate of speed hit another car broadside, much damage would be done. The appellant swore that his speed was 30 to 35 miles per hour. There is no contention that a car traveling at that rate along Palmquist Road would be moving at an imprudent speed. Although there is no evidence upon the subject, we believe that it is obvious that a car traveling at a speed of 30 to 35 miles an hour would inflict great damage upon colliding with the side of another car. Undoubtedly, the fenders and body of the victim would be crushed. The extent of the damage would be dependent upon circumstances, such as (a) the respective weight of the cars, (b) the condition of their tires, (c) the condition of the surface of the pavement, and (d) the speed of the car which received the blow.

The damage wrought in some collisions appears to be freak or capricious. In some instances, the occupants of the cars emerge unscathed although the cars are total wrecks; in others the damage to the cars is minor but that to the occupants is appalling. In all instances, however, the law of physics operates indiscriminately and what appears to be novel damage in a particular case would be readily understandable if all of the circumstances were brought to light.

We know of no method whereby the approximate speed of the appellant's car can be determined from the damage which it caused. The damage, of course, proves that it was traveling rapidly, but it was upon a through way where rapid movement under normal circumstances is lawful. If it were true that all cars traveling at prudent speeds inflict no damage, and that only those proceeding at unlawful rates crush

objects which they strike, then the results of this collision would prove negligence. But there is no such rule, and, so far as we know, a car traveling at a careful rate of speed, upon colliding with one which entered an intersection unlawfully, would cause all of the damage which the respondent's witnesses described.

The burden of proof rested upon the respondent to prove that the appellant's speed was negligent. That burden could not be discharged by the submission of evidence showing no more than a conjecture or possibility favorable to the respondent. It is our belief that the damage inflicted by the impact fails to establish negligence upon the appellant's part.

As we have stated, the appellant, when upon the witness stand as a witness for the respondent, swore, in response to a question propounded by the respondent's attorney, that his speed was 30 or 35 miles an hour. The respondent was at liberty to challenge the truthfulness of that answer: § 4-709, O. C. L. A. As we have seen, she was prevented by an erroneous ruling from having her brother testify that he estimated that the appellant's speed was 50 miles an hour. We shall now determine whether or not that testimony, if received, would have made the allowance of the nonsuit erroneous.

A previous paragraph of this opinion points out that the designated speed on Palmquist Road was 55 miles an hour. The uncontradicted evidence shows that the appellant's car was in good mechanical condition. There were no cars in sight except the appellant's and Mr. LaValley's. The only traffic hazard which confronted the appellant as he approached the intersection was the shrubbery on the southwest corner which obstructed his view into Hogan Road. The

appellant was straddling the center of the roadway as he drove along Palmquist, and, according to his unchallenged testimony, a driver on that thoroughfare can see the stop sign in Hogan Road when he is within 40 feet of the intersection. The stop sign is 20 or 25 feet south of the intersection.

In determining whether or not a speed of 50 miles per hour, if such was the rate at which the appellant was traveling, was negligent, due heed must be taken of the fact that Palmquist Road is a through way. The purpose of such highways is to expedite traffic and promote safety. They draw through traffic from other thoroughfares and thereby relieve the latter of rapidly moving cars. They promote safety by requiring all cars before entering to stop, look and yield the right of way. They expedite traffic by enabling the cars which use them to proceed upon the assumption that cars upon laterals will stop before entering the through way. Of course, all users of public thoroughfares must exercise due care, but the latter is a relative term. What constitutes due care upon one type of thoroughfare is not necessarily the same as that upon others. The driver upon a through way is entitled to assume, until indications to the contrary appear, that all cars will stop before entering and yielding to him the right of way in the event that a collision would otherwise occur.

We quote the following from *Miller v. Asbury*, 13 Wash. 2d 533, 125 P. 2d 652:

"The purpose of the statute is to prevent just such accidents as that described by the evidence in this case, Arterial highways carry fast moving traffic. Numerous accidents will occur unless such highways are entered with care. The legislative policy and purpose are not to permit an operator of

a vehicle approaching an arterial, as distinguished from an ordinary, highway, to speculate as to whether he may safely drive into it without stopping. It provides that he shall stop and make certain preliminary observations. The statute is mandatory. It says he *'shall stop as required by law.'* An interval is thus forced upon him, a period during which he is entirely free from the task of operating his own vehicle, and he is told exactly what he must do during that interval, and in equally mandatory language — *'and having stopped shall look out for and give right of way to any vehicles upon such arterial * * *.'* (Italics ours.)

"Furthermore, the statute, by requiring a stop at the entrance to the intersection, insures the vehicle's arrival at the traveled portion of the arterial at such a slow rate of speed that, even if its operator has for some reason previously failed to detect a car approaching on the arterial, he can still obey the other mandate of the statute and 'give right of way.' In brief, the mandatory commands of the statute to the operator of a vehicle about to enter an arterial are—stop and give your entire attention to looking for traffic on the arterial, and if you see a vehicle thereon about to cross, give it the right of way. If these commands of the statute are obeyed, it is very difficult to imagine how an accident of the kind with which we are now dealing can occur, especially at an unobstructed crossing.''

■ The appellant had a right to assume as he neared the Hogan intersection that the duties stated by the quoted language would be performed by any motorist intending to enter Palmquist Road. He was not required to believe that a car would emerge from the concealed road without stopping. Nevertheless, it was his duty to keep alert and maintain a lookout. The fact that he saw the LaValley car the moment it came into view proves that he was alert and that his lookout

was adequate. The pavement was 24 feet broad and the adjacent shoulders were broad. Nothing has been called to our attention showing that a speed of 50 miles per hour, if such was his, was unreasonable.

In *General Exchange Ins. Corporation v. Kelly*, (La.), 198 So. 377, the facts were substantially the same as those we are considering. The court held that the speed of 50 miles per hour upon the part of the car which struck the one emerging from a concealed way was not negligent.

 The designated speed on Palmquist Road was five miles an hour more than Mr. LaValley wished to attribute to the appellant. We do not believe that any inference is permissible that the appellant, if his speed was 50 miles an hour, was driving negligently.

 We conclude that error was committed when the motion for a nonsuit was overruled. It should have been sustained.

The sixth assignment of error challenges the ruling which permitted Mr. LaValley to testify that his injuries confined him in a hospital for five weeks. We mentioned that testimony in relating the effects of the impact, but, in so doing, intended no intimation whatever concerning its admissibility. Since we believe that the motion for a nonsuit should have been sustained, there is no occasion for determining the merits of that assignment of error. Likewise, we are not required to consider the second, third, fourth and fifth assignments of error.

 The appellant's opening brief failed to comply with Rule 13 of this court, which requires the brief filed by an appellant to follow the statement of a challenged ruling with the objections which he made in the circuit court. The purpose of this requirement is to

bring together the challenged ruling and the overruled objection, thus centering attention upon the actual matter which was presented to the trial judge. When appellant's counsel discovered the defect in their brief, they filed a reply brief which supplied all omissions. It, in effect, superseded the original brief. Under the circumstances, we do not believe that the cost bill should include a charge for the first brief.

Reversed.