Argued May 19, affirmed June 3, 1953

QUETSCHKE, Adm'x *v.* PETERSON and ZELLER

258 P. 2d 128

*C. S. Emmons,* of Albany, argued the cause for appellant. On the brief were Willis, Kyle & Emmons, of Albany.

*Karl T. Huston,* of Corvallis, argued the cause for respondents. On the brief were Huston & Thomas, of Corvallis.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, TOOZE and PERRY, Justices.

TOOZE, J.

This is an action to recover damages for the death of Rudolph Quetschke, plaintiff's intestate, resulting from the alleged negligent operation of a motor logging truck and trailer by the defendants Fedell Peterson and M. Zeller. The case was tried to a jury, resulting in a verdict and judgment in favor of plaintiff in the sum of $9,000. Upon defendants' motion, the verdict and judgment were set aside, and judgment notwithstanding the verdict and dismissing the action was entered in favor of defendants. Plaintiff appeals.

In our consideration of this matter, we are required to and do view the evidence in the light most favorable to plaintiff.

The deceased, Rudolph Quetschke, was an employe of one Mel Garriott, a logger, being generally

employed as a high climber and rigger in the woods. For several years immediately prior to and at the time of the accident involved in this case, Garriott and the defendant M. Zeller had been and were engaged in interrelated logging operations. Defendant Zeller procured the standing timber, arranged for its falling and bucking, and for transportation of the logs from the woods to the place of sale. Garriott, in turn, carried on the yarding and loading operations, using trucks and machinery furnished by Mrs. Zeller. Each of these individuals employed their own crew of workmen.

Immediately prior to and at the time of the accident on June 6, 1950, defendant Zeller and Garriott were conducting logging operations at two different sites located northeast of the town of Wren, in Benton county, Oregon.

Defendant Peterson was employed as a logging truck operator by his codefendant Zeller. On June 6, 1950, Peterson left Wren with the logging truck and trailer at about the hour of 5:45 a.m. on his way to the woods to secure a load of logs. At Wren, one Sam Cokely, an employe of Garriott, boarded the logging truck for the purpose of being transported to the loading site. It was Cokely's duty to load the truck and trailer.

The truck was being driven with the trailer down, that is, the trailer was extended behind the truck and was not riding on the platform on the back thereof as is customary when no load is being carried. The truck and trailer were of the usual kind, with two front wheels, dual axle and dual-tire drive wheels behind the cab, and with a wooden reach approximately 28 feet in length extending out behind, and dual axle and dual-tire wheels on the trailer.

To reach the logging site, it is necessary to leave the county road and drive over what appears to be a private roadway. Before entering the private road, it is necessary to remove a section of wire fence. About 150 feet beyond this fence, there is another fence with a 14-foot wide wooden gate to be opened. The gate which was there at the time of the accident was built out of green 1″ x 6″ rough lumber, and was fastened to the gatepost by two loops of baling wire, not by hinges. It was a gate that had to be lifted and carried in opening it. It opened toward the county road, swinging to the left of and toward one approaching from the county road. The traveled portion of the private roadway, with two well-beaten tracks, was approximately nine feet wide.

When Peterson arrived with the truck and trailer at the point of the county road, about a mile from where entry into the private roadway was to be made, he found the decedent, Rudolph Quetschke, and his employer, Mel Garriott, awaiting his arrival. Quetschke had been directed by his employer to assist Cokely in loading, and became a passenger on defendants' truck, to be transported to the loading site for that purpose.

Upon arriving at the entrance to the private roadway, Peterson took down the section of wire fence. At the time, there were some sheep in the enclosure. Peterson, Cokely, and Quetschke drove the sheep into another enclosure so as to make it unnecessary to take down that section of fence upon each trip made by the logging truck. The parties were engaged in the task of penning up the sheep for about 20 minutes.

Thereupon, Quetschke walked ahead to, and did, open the gate. Cokely took a seat with the defendant Peterson in the truck. What happened then is best

explained by the testimony of the defendant Peterson. He was the only eyewitness to the accident that testified. Cokely could not be located. Upon direct examination, Peterson testified as follows:

"Q. How far back from the gate was the front end of your truck at the time you got out to corrall the sheep and Mr. Quetschke walked up and opened the gate?

"A. Fifty yards.

"Q. 150 feet?

"A. Yes.

"* * * * *

"Q. Had you stopped the motor?

"A. I believe I had.

"Q. Now, when Mr. Quetschke walked on up and opened the gate what did you and Cokely do?

"A. After we got the sheep in we pulled the gate closed and got into the truck.

"Q. You mean the wooden gate holding the sheep?

"A. Yes.

"* * * * *

"Q. Now this land here. * * * Observe the terrain here where the tracks were, were there any depressions in there?

"A. Just slightly. A little up grade in the gateway.

"Q. Were there any deep ruts in the tracks?

"A. No.

"Q. Any grass and sod outside the tracks or was that pretty level?

"A. Yes.

"Q. Sloped any at all?

"A. No.

"Q. Was there a little slope as you went toward the gate?

"A. Just slightly, very little.

"Q. Did that pick up a little as you went through the gate?

"A. Not very much.

"* * * * *

"Q. Now then, when Mr. Quetschke opened the gate what did he do? Did you watch him?

"A. I saw him starting and - - -

"Q. Tell us how he opened the gate.

"A. He picked it up after he wired it. He kinda had his back turned toward me when he picked it up.

"Q. That's the gate?

"A. Yes. There was about six feet clearance there.

"Q. You mean from the outside of the gate. Is that where Mr. Quetschke was standing?

"A. Yes.

"Q. *There was six feet clearance to your truck there?*

"A. *Yes.*

"Q You say he had his back toward you, directly or at an angle?

"A. He was kinda to the side of the gate, ready to pick it up and close it.

"Q. Would you say he was facing the roadway?

"A. He had his head turned, he was watching me.

"Q. You pulled into low and started up?

"A. Yes.

"* * * * *

"Q. You drove on past Mr. Quetschke then?

"A. I started to pull through the gate.

"Q. How far is it to where you get your loads on the side, how far are the bunks in this direction?

"A. 7½ feet.

"Q. This direction?

"A. The same.

"Q. Do the ends of the bunks stick out even with the edges of the outside duals?

"A. I think they are just about flush.

"* * * * *

"Q. * * * When you drove on past Mr. Quetschke as soon as your door got past he was outside of your vision, wasn't he, and you were looking at the gate?

"A. Yes.

"Q. After having seen him you were looking ahead?

"A. Yes.

"Q. From the time you last saw him, did he move between—did you see him move any?

"A. No, I didn't.

"Q. You proceeded on with your truck now. Where were you when you first heard that wood splintering noise? Can you tell where it was?

"A. The truck was sitting about up here. I would say it was through the gateway about—extended about ten feet.

"Q. Would that be the back or front of the cab?

"A. Well, I would say from the back end of the truck.

"* * * * *

"Q. * * * you had gotten approximately ten feet past that gateway when you heard that noise?

"A. Yes.

"Q. When you heard that noise what did you do?

"A. I stopped as quickly as I could.

"Q. How fast were you going?

"A. Well, I would say not over about four miles an hour.

"Q. Were you still in your compound low?

"A. Low gear.

"* * * * *

"Q. Had you shifted gear any from 150 feet back of the gate until you heard the noise?

"A. No.

"* * * * *

"Q. How far would you say from the time you heard that splintering noise, how far did your truck go until you stopped?

"A. I don't know. I don't imagine I went over a foot and a half." (Italics ours.)

The splintering noise referred to in the testimony was the breaking of the gate when it came in contact with the truck or trailer. How it happened to be struck is not disclosed by the record. Quetschke was found lying on the ground with his feet toward the rear, and his head slightly underneath the inside front dual on the trailer on the left side; one of his hands was caught between the duals on the trailer. The truck had to be moved ahead and back so as to free decedent's head from the wheels. Quetschke was not killed instantly, but died shortly after the accident.

In her complaint, plaintiff charged defendants with negligence in four particulars as follows:

"(a) They failed to keep a lookout for decedent who was opening the gate.

"(b) They drove at a speed that was greater than was reasonable and prudent under all the circumstances as above outlined.

"(c) They turned the truck too sharply and caught the gate instead of passing through and allowing sufficient clearance which would have been possible for them to do.

"(d) They failed to have the truck under control so that they could stop the same immediately upon striking the gate and before pulling the decedent under the truck."

By their answer, defendants denied all the acts of negligence charged against them, and affirmatively

charged decedent with contributory negligence in the following respects:

"(a) That said Rudolph Quetschke failed to keep a proper or any lookout for said logging truck or its movements, although he knew that said truck was to be driven through said gate;

"(b) That said Rudolph Quetschke failed to place himself in a place of safety, although he knew that said truck was to be driven through said gate;

"(c) That said Rudolph Quetschke walked into the side of said truck and trailer at and when it was in motion."

Defendants also alleged that Quetschke was being transported in said truck as a guest of defendants, thus seeking to bring this case within the provisions of the so-called guest statute: § 115-1001, OCLA.

By her reply, plaintiff denied all new matter alleged in the answer inconsistent with or contradictory to the allegations of her complaint.

Upon the conclusion of plaintiff's case in chief, and after she had rested, defendants moved the court for an order and judgment of involuntary nonsuit. The motion was denied. Thereupon, defendants, without offering any evidence, rested their case, and moved the court for a directed verdict in their favor. This motion also was denied, and the matter was submitted to the jury.

The sole question before us on this appeal is whether there is any substantial evidence in the record that justified the submission of the case to the jury.

It is elementary that, as a basis of recovery in this action, it was encumbent upon plaintiff to establish by a preponderance of the evidence the existence of one or more of the acts of negligence charged against defendants.

It is obvious that if the testimony of the defendant Peterson is to be accepted at face value, defendants were not guilty of any of the acts of negligence charged against them.

Peterson's testimony shows that he maintained a lookout ahead and on both sides of the roadway as he approached and entered the gateway. He saw decedent at and facing the end of the opened gate. When the front end of the truck passed decedent, he was standing from five to six feet to the left of the side of the truck, and in a place of safety. The truck and trailer proceeded straight ahead in the roadway. In such circumstances, defendant Peterson had the right to assume that decedent would remain where he was until the truck and trailer had completely cleared the gateway, and to give his attention to the road ahead. In the absence of unusual circumstances, the lookout required by the law is largely confined to the front and to the right and left at intersections. There were no unusual circumstances in this case. The record fails utterly to disclose any evidence that defendants did not maintain a proper lookout.

Neither is there any evidence in the record to show that defendants were operating the truck at a speed greater than was reasonable and prudent under all the circumstances of the case. Peterson testified that he was operating the equipment in low gear, and at a speed not in excess of four miles per hour. That is not much more than ordinary walking speed. Moreover, there is nothing in the record showing or tending to show that the speed of the vehicle did or could have anything to do with the cause of the accident.

There is no evidence whatever to the effect that the truck was turned too sharply after entering the gateway. The truck itself, exclusive of the trailer, had

hardly cleared the gateway when the accident occurred, and the truck was brought to an immediate stop. When stopped, the truck was found to be in the roadway, with ample clearance on both sides.

It is clear from Peterson's testimony that he had his vehicle under proper control. After hearing the splintering of the gate, he brought his truck to a stop within one or two feet. In 2 Berry, Automobiles, 7th ed, 429, § 2.389, it is stated:

"A car is 'under control' within the meaning of the law if it is moving at such a rate, and the driver has the mechanism and power under such control that it can be brought to a stop with a reasonable degree of celerity."

See also *Spence, Adm'x v. Rasmussen et al.,* 190 Or 662, 681, 226 P2d 819; *Nolen v. Corvallis Auto Transit Co.,* 138 Or 98, 4 P2d 624.

As before observed, Peterson was the only person that testified who had actually witnessed the events leading up to and following the accident.

Plaintiff argues that the jury was not required to accept Peterson's testimony in its entirety; that it might base its findings upon the physical facts, if such physical facts contradicted the oral testimony. As an abstract proposition, that is true, but it is not applicable to the facts in this case.

In the first place, the claimed physical facts that might be deemed material in no way contradict the testimony of Peterson. In truth, the existence of those physical facts depends in large measure upon the evidence offered by Peterson. The broken condition of the gate and the location of its parts immediately following the accident, together with the position of the truck and trailer when brought to a stop, and the man-

ner in which decedent was lying on the ground under the wheels of the trailer, are all facts dependent upon Peterson's description thereof.

Assuming that the jury had the right to reject portions of Peterson's testimony, and accept other parts, just where was it to draw the line? In any event, it must accept as true his testimony as to events transpiring from the time decedent became a passenger in the truck, up to the time the gate was opened and the truck proceeded through the gateway. From that point on, if the jury rejected all of Peterson's testimony except that relating to the physical facts, it is manifest that nothing remained upon which it could logically and reasonably base a verdict in favor of plaintiff. Such a verdict could only be the result of pure speculation. As pointed out before, there is nothing in the record, not even the physical facts, that even slightly tends to prove the existence of any one or more of the acts of negligence charged, and it is upon proof of those acts of negligence, and no others, that plaintiff is entitled to prevail, if at all.

The trial court granted defendants' motion for judgment notwithstanding the verdict upon the ground that decedent was guilty of contributory negligence as a matter of law. There is no direct evidence in the record as to just what decedent did that brought him into contact with the truck and trailer. To say that the accident was caused by decedent's own negligence requires a dependence entirely upon the physical facts, and inferences to be drawn therefrom. In our opinion, under the facts of this case, that conclusion also must depend largely upon conjecture and speculation.

However, the fact does remain that in some manner decedent came into contact with the truck and trailer and suffered fatal injuries. If we were per-

mitted to speculate, the known facts would justify a guess that decedent forgot about the trailer and the long reach between the truck and the rear wheels of the trailer, and, after the truck had passed him, lifted the gate and started to close it, being stopped by the reach and struck by the rear portion of the trailer immediately in front of the wheels thereof. This is a far more reasonable speculation than any that could be indulged in to support the verdict.

■ It is axiomatic that no verdict can stand that necessarily depends upon conjecture and speculation. *Wintersteen v. Semler*, 197 Or 601, 250 P2d 420, 255 P2d 138; *Becker v. Tillamook Bay Lbr. Co. et al.*, 194 Or 134, 143, 240 P2d 237; *Spain v. O. W. R. & N. Co.*, 78 Or 355, 369, 153 P 470, Ann Cas 1917E 1104. Defendants' motion for a directed verdict in their favor should have been sustained, as there was no substantial evidence sufficient to submit the question of defendants' alleged negligence to the jury.

In the pleadings, upon the trial, and in this court much is said about the status of decedent at the time of the accident, defendants claiming that he was a guest within the meaning of the guest statute of this state. In view of what we have already said, it is unnecessary for us to discuss that phase of the case.

The judgment is affirmed.