Argued May 3, reversed and remanded with directions June 8,
petition for rehearing denied August 3, 1955

# LEMONS ET AL *v.* HOLLAND ET AL

284 P. 2d 1041
286 P. 2d 656

*A. S. Grant* argued the cause for appellants. On the briefs were Grant & Fuchs, and Gene C. Rose, of Baker.

*Harold Banta* argued the cause for respondents. On the brief were Banta, Silven and Horton, of Baker, and Wilson and Olsen, of John Day.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK and PERRY, Justices.

TOOZE, J.

This is an action for damages for the death of James Cedric Lemons, plaintiffs' intestate, resulting from the alleged negligent operation of a motor vehicle by defendant Margery Holland. The case was tried to

a jury. A verdict was returned in favor of plaintiffs in the sum of $10,000; judgment was accordingly entered against defendants, and they appeal.

The action is prosecuted by Hazel Lemons and Byron Lemons, as joint administratrix and administrator of the estate of James Cedric Lemons, deceased, for the benefit of said Hazel Lemons, as widow, and Patricia Lemons, daughter and dependent, of decedent, pursuant to the provisions of ORS 30.020.

Defendant Margery Holland is the minor daughter of defendant Leslie Holland, and a member of his family. At the time of the accident hereafter described, defendant Leslie Holland and his wife were the owners of a 1951 Pontiac four-door coach automobile, which was kept and maintained for family purposes.

In their brief on this appeal, defendants set forth eleven assignments of error. Assignments of error numbered I, II, and III are as follows:

(1) The court erred in denying defendants' motion for an involuntary nonsuit; (2) the court erred in failing to give the following requested instruction: "Members of the Jury, I instruct you to return a verdict in favor of the defendants."; and (3) the court erred in denying the motion for judgment in favor of defendants notwithstanding the verdict.

Defendants' fourth assignment of error is directed to the action of the trial court in overruling their general demurrer to the complaint. The remaining assignments of error are directed to certain requested instructions refused by the court, and to other instructions given by the court. The view we take of this case will render unnecessary a discussion of any of the assignments of error other than the first three.

■■ The first question presented is whether there is any substantial evidence in the record to support

the verdict. The question of the insufficiency of the evidence was the question presented to the trial court by the motion for a nonsuit, the motion for a directed verdict, and the motion for judgment notwithstanding the verdict, all of which were overruled. It is axiomatic that in considering that question on this appeal we must view the evidence in the light most favorable to plaintiffs. They are entitled to the benefit of every just inference that may reasonably be drawn from the evidence in their favor. It is necessary, therefore, that we carefully examine the entire record.

During all the times material to this litigation, U. S. Highway 26, commonly known as the John Day Highway, has been and is a public highway, extending in a general easterly and westerly direction through Grant county, Oregon, and connecting, among other places, the cities of Mt. Vernon and Dayville, located in said county. Dayville is located westerly from Mt. Vernon. The highway between Mt. Vernon and Dayville, particularly at the scene of the accident, is a hard-surfaced highway with graveled shoulders of varying widths on each side, and the paved portion is 20 feet in width. The center line of the highway is marked with a yellow stripe. At the place where the accident occurred the road is straight and level, affording a clear vision for a quarter of a mile or more both easterly and westerly on and along said highway. Shortly before the accident some work had been in progress in widening the gravel shoulders along the road at that point, and gravel had been dumped on the shoulders for that purpose. At the time of the accident, it was very dark, but the pavement was dry, and there was neither rain, mist, nor fog which might obscure the vision.

Prior to and at the time of the accident, decedent,

with his family, lived on the south side of the highway at a point approximately 400 feet westerly from the scene thereof, and had lived there for a considerable period of time. Defendants lived a short distance easterly from Mt. Vernon.

On November 28, 1953, between the hours of 8 p.m. and 9 p.m., the defendant Margery Holland drove from her home through Mt. Vernon to the home of a girl friend who lived somewhere west of Mt. Vernon. The purpose of this visit was to make arrangements to attend a dance in Prairie City, Oregon, a community located about 20 miles easterly from Mt. Vernon. The arrangements were completed, and Margery returned to her home, where she changed her clothes and generally prepared for the dance.

Between 9:30 and 10 p.m., Margery left her home and started the trip to get her girl friend in the family automobile. It might be stated at this point that the circumstances, including the late hour, justify an inference that Margery was hurrying back to pick up her girl friend so that they could be on their way to the dance.

When Margery reached a point on U. S. Highway 26, approximately one-half mile west of the city of Mt. Vernon, her car struck and killed plaintiffs' decedent. Grant county sheriff Robert Damon was immediately called and reached the scene of the accident about 10 p.m. He made some investigation that night and took some pictures of the body of decedent and the Holland car. The next morning he made a more complete investigation at the scene. He testified as a witness for the plaintiffs. The following is from his direct examination:

"A It was 9:50 when I arrived at the scene of the accident.

"Q Go on.

"A It was very dark; and I found the remains lying on the left hand side of the road, just partly on the edge of the pavement and partly on the. gravel, and at that time there had been gravel dumped on the south side of the road, to make a wider shoulder than had formerly been there. He was laying partly on the gravel and partly on the paved part of the highway, and directly north of him was the car we presumed at that time had caused the accident.

"Q Did you examine the car?

"A Yes.

"Q What did you observe in respect to the car?

"A I found on the left hand side of the car a headlight broken. I found a dent between the fender and the grill, and I found the radio aerial broken off.

"Q Did you also notice this body you spoke of?

"A Yes, sir.

"Q Did you examine the body?

"A I did.

"Q Did you recognize it?

"A Yes, sir.

"Q Who, again, was it?

"A It was Cedric Lemons.

" * * * * *

"Q (MR. OLSEN) Will you tell the jury what you observed in respect to this body?

"A I found the body laying on the road, with his head pointing down the road, and feet back toward Mount Vernon; his head badly mangled; his forehead practically torn off; his face and nose practically torn off; one arm badly crushed, and both legs broken, compound fractures in both legs. I found his clothes, one shoe was gone. He had a dark suit on, and he had a white plaid shirt on. His coat—his sleeves were pulled 'way up. The shirt was completely unbuttoned. The man was on

his back. His shirt was back underneath him pretty well. He had on a white undershirt. There was lots of blood on his clothes. That is about all, I guess, I can tell.

"* * * * *

"Q Aside from the body and the car portrayed in those pictures did you make any other observations in the area that evening, Sheriff?
"A Yes, I did.

"Q Tell the jury what you saw?
"A I observed the skid tracks left by the automobile. I found the little girl that was involved in the accident—Miss Holland—in the automobile. I sent her back to my house, with my daughter in my own car. That is about all that night.

"Q You say you observed some skid tracks on the road. Were you able, from your examination and observation, to conclude what automobile had been responsible for those tracks?
"A Yes, we were, because the automobile had stopped, and then backed up. The automobile was off the skid tracks at the time I arrived there; but the little girl told me that was her tracks.

"Q When you say 'Little Girl'?
"A I mean Miss Holland.

"Q Did you at that time make any measurements of those skid tracks?
"A Not at that time. We made measurements the next morning.

"Q About what time the next day?
"A About eight o'clock.

"Q Anybody assist you?
"A Yes.

"Q Who was it?
"A Otis Green.

"Q Is that correct?
"A Yes.

"Q Could you tell us from your recollection, or if you have any note you made at that time to refresh your memory, what the over-all length of those skid tracks was?

"A (Referring to memo.) Over all length of them was 210 feet.

"Q In respect to this body, where did the skid marks or tracks start? Was it to the east, or west of the place where the body was found?

"A They started to the east of the place where the body was found.

" * * * * *

"Q Did you observe some blood in the course of those skid tracks?

"A Yes.

"Q Starting from the east, going west, where did you first observe blood in respect to the starting point of the skid marks?

"A Seventy-nine feet from the skid marks.

"Q Did you see any other blood on the highway or any place around there from that point on?

"A Yes, I did.

"Q Tell us where else you saw blood?

"A I saw blood down the highway from the point where I first observed blood and brains being on the highway—a trail of it for eighty-four feet; and it slanted from a little bit to the left of the yellow line to the edge of the highway, eighty-four feet.

"Q And at the point where the trail ended, what was there?

"A The body.

"Q Going east from the point where you first observed this blood—that is, toward Mount Vernon —did you observe anything else on the road?

"A Found some glass.

"Q Were you able to determine what that glass came from that you saw in the road?

"A Yes; it came from the headlight of that car.

"Q Where was that glass on the highway in respect to the most easterly portion of the skidmarks?

"A Thirty feet.

"Q Mr. Damon, at any time during the night of November 28th, 1953, other than the occasion you have already spoken to us about, did you talk to Margery?

"A Yes.

"Q Where was it you spoke to her?

"A At my house.

"Q Will you tell us who was present?

"A Her father was present, my wife, my daughter, Orville Yokom and Doctor Jerry.

"Q Did you speak to her about the events of the evening?

"A Yes, I did.

"Q Did she tell you about the accident?

"A Yes, she did.

"Q Did she tell you anything about whether or not she observed Bud Lemons before the collision?

"A She said that she observed something, but she didn't know what it was.

"Q Did she tell you anything about her speed?

"A Yes.

"Q What did she tell you about her speed?

"A She said she was driving fifty-five miles an hour."

The witness testified as follows on cross-examination:

"Q Did she tell you how soon it was she saw this object before the car struck it?

"A She said just as she saw it she hit it.

"Q How far from the yellow line was the nearest skidmark?

"A About two feet.

"Q About two feet?

"A Yes, sir.

"Q And how far from the yellow line was it that you found the glass?

"A Practically on the yellow line.

"Q Practically on the yellow line?

"A Yes, sir.

"Q Did these skidmarks that went down the highway go crooked, or go straight?

"A Just about as straight as you could stretch a string.

"Q Did they go straight down the highway, or did they go sort of to one side?

"A No, sir; they ran straight down the highway, until just about—the car stopped, and then they veered a little to the right.

" * * * * *

"Q You say the aerial on the car was broken?

"A Yes, sir.

"Q Now this dent that shows in the picture, Exhibit 'B', is that the dent you referred to in your testimony awhile ago?

"A Yes.

"Q Were there other dents in the car?

"A None I observed. The radio was broken; that dark spot (Indicating on photograph).

"Q Were there any other dents on the car, further back, or anything of that kind?

"A Not that I observed.

"Q Was the windshield broken?

"A No, sir.

"Q I believe you said that there was a shoe torn off?

"A Yes, sir.

"Q Is that the shoe that appears in this picture?

"A Yes, it is.

"Q Were they a light dress shoe, or—

"A They were just dress shoes.

"Q Did Margery tell you whether or not she looked at the speedometer shortly before this accident occurred?

"A Yes, sir.

"Q What did she tell you?

"A Told me she was driving fifty-five miles an hour. I asked her how she knew, and she said, 'Because I saw the speedometer.'

"Q Did she also tell you about another car approaching from the other direction?

"A Yes, sir.

"Q I don't suppose you made any investigation to see whether or not the other car left any brake marks?

"A No, I didn't.

"Q You didn't make this examination of yours that you have spoken of, giving these distances as to where you found these things, until the next morning?

"A Until next morning.

"Q You found some glass first. Was this all that was there?

"A The glass, and aerial off the car.

"Q And further down you found some blood, and I believe you said some bits or parts of brains?

"A Yes, sir.

"Q And then, you say, you saw this blood. Did you just see drops of blood here and there, or what was it?

"A A good definite mark where a man had slid and left this blood and brains strung for a—the distance I have mentioned.

"Q Did it show that the body slid?

"A Yes, sir.

"Q You could determine that is was sliding, rather than whirled?

"A Yes, sir.

"Q How could you determine?

"A No; I could not say that, whether it whirled or slid, I don't know. There was a very definite mark there.

"Q All you actually noticed was blood?

"A And you could see a very definite trail where the body had passed over that part of the highway."

On the re-direct examination of the witness, we find the following testimony:

"Q I would like to ask Mr. Damon to tell us the condition of the road as he observed it November 28th, when he examined the scene of the accident?

"A The road was in excellent condition, and it was dry.

"Q I know from my own personal knowledge they have been working on the road between John Day and Dayville.

"A All that had been done there was some gravel had been dumped on the south side of the road and smoothed over.

"Q But the pavement in the middle was in what condition?

"A Perfect condition.

"Q Do you recall the visibility that night?

"A Very dark.

"Q Raining?

"A No, sir; it was dry.

"Q Was it overcast?

"A I believe it was. It was very dark."

On re-cross examination the witness gave this further testimony:

"Q You say this gravel was levelled off?

"A Just smoothed off. It wasn't perfectly level, but dumped in there and smoothed off.

"Q How wide was the shoulder on the south side there?

"A About four feet.

"Q How wide was the shoulder on the north side?

"A Approximately the same width.

"Q The north side of this highway is the side Margery was driving down, was it?

"A Yes; that would be right.

"Q It was her right side, traveling in a westerly direction?

"A Yes, sir.

"Q There was a yellow line there in the highway?

"A Yes, sir."

One Otis Green assisted Sheriff Damon in making the measurements the morning after the accident. As a witness for plaintiffs, Green corroborated the testimony of Damon. As to the stopping place of the blood stain he noted on the highway, the witness Green testified as follows:

"Q Could you tell us where you observed this blood stain to stop?

"A Oh, I should say two feet or two and a half from the yellow line on the south side as you go down the highway, on the left hand side of the yellow line, and gradually down the road veering to the south down the highway until the body—or I presume that is where the body had come to rest. That is where they said it was. It had rocks on the shoulder, and when it hit that it plowed into those rocks and stopped. It started two and a half feet from the center line."

Green also testified that four days after the accident he found one of decedent's shoes in the ditch on the north side of the pavement. The shoe was identified

and, over the objection of defendants admitted in evidence.

On cross-examination Green testified as follows:

"Q Mr. Green, in your testimony earlier this afternoon, when you were asked concerning marks you could see on the left hand side of the yellow mark and on the right hand side; and I haven't got it clear in my mind as to what you meant by the left and right, so I think in order to make it clear let's use directions. The highway out there, as I understand it, runs east and west; and west is going toward Dayville from Mount Vernon, and east is going from Dayville to Mount Vernon. Is that right?

"A That is right.

"Q And the home of Bud Lemons was to the west of Mount Vernon?

"A Right.

"Q Now these marks that you have testified, which you saw where you saw the skidmarks,—those were on the north side of the highway, were they not?

"A Correct.

"Q Now the mark that you saw, where you said your best recollection it was, it was about the same as that given here, that was the first blood mark you saw—was north of the yellow line, wasn't it?

"A No, it was south. If I testified that I didn't do it intentionally. The first mark I saw was north from the yellow line, on the south side of the road —the side the body was found on.

"Q Were you here when the Sheriff testified to seeing a mark on the highway which he identified as being blood and brain parts?

"A Yes.

"Q What side of the yellow line? First I will ask you if you saw that spot?

"A Yes.

"Q Was that on the north or south side of the yellow line?

"A South side.

"Q And how far south of the yellow line on the south side?

"A Are you speaking of the line or where the body stopped,—the brains? There was a line that ran diagonally from two and a half feet from the yellow line, from 78 to 79 feet—I don't know the exact number—then it ran diagonally up to 84 feet on the south side of the line at the extreme left hand side of the highway, which would be the south side, to where the body stopped.

"Q I understand the body was on the south?

"A Yes.

"Q This point which you say was 78 or 79 feet, —that point begins to the north of the yellow line?

"A No. South.

"Q How far south of the yellow line?

"A About two and a half feet, I would say.

"Q About two and a half feet?

"A Yes.

"Q Well then, as I understand it, from the examination that you made, there were no blood marks on the highway anywhere from the place where the skidmarks started to the place where the skidmarks stopped, north of the centerline?

"A That is right. I didn't see any.

"Q You didn't see any blood or you didn't see any part of the brains, or anything of that kind, lying on the highway, for the distance of those skidmarks any place north of the center line?

"A Correct.

"Q Did you see anything other than the skidmarks north of that yellow line when you made your examination?

"A Not that day I didn't. That was the day we measured the skidmarks, I didn't. I see [sic]

some glass in the road, but the skidmarks is the only thing I paid any attention to.

"Q You say you saw glass in the road, but paid no attention to that?

"A Someone said, 'That's where she broke her headlight.' I didn't measure or step it. I saw the glass in the road. I was there helping the Sheriff.

"* * * * *

"Q Did the skidmarks ever leave the traveled, paved portion of the highway?

"A Not until the car stopped, just when it stopped they did, with one front wheel. One front wheel went over into the edge of the soft shoulder.

"Q Were the skidmarks the same all the way down to where the car stopped, or was there a difference in the intensity?

"A I would say they was practically the same, awful, awful—awful uniform.

"Q When they first started were they faint, or very abrupt, or—?

"A I wouldn't say they was too abrupt any time. It was just a plain skidmark; but I would say it was practically as abrupt when it stopped as it was when it started.

"Q But you did say that they did not appear to be abrupt anywhere the full length of them?

"A No.

"Q In other words, it was not one of those deep marks like you would see from, for instance, one of these big trucks when they—

"A (Interrupting) No.

"Q It was just enough you could see it on the highway? Is that about it?

"A Well, it was a plain skidmark.

"Q I understand that.

"A Yes.

"Q I am not trying to—It is a little difficult to present the question all together—and I am trying to get at with you, Mr. Green—Let's try to use colors.

"A O.K.

"Q Would you say it was a real dark black color, or colored all the way down, or sort of grayish color?

"A I would say it wasn't what we call a real heavy skidmark. I know what you mean,—you start to run over a dog and throw on your brakes. It was a skidmark easy to see. It wasn't real heavy at any one place. It was pretty even all the way down. And it was straight.

"Q I don't know whether you testified to it or not. It was straight? It didn't waver?

"A That's right. It wavered just at the last.

"Q Where it turned a little to the right, right at the end there?

"A Uh huh."

Byron Lemons, who was at the scene of the accident the next morning, made some observations respecting the highway. He testified:

"Q Did you notice the shoulders of the road?

"A Yes.

"Q Would you tell the jury in your own words what the condition of the shoulders was?

"A Well, they had dumped some gravel along there on the south side, between it and a ditch. It was ditched between the road and the fence; so I imagine the gravel on that side,—it was rocks and the like of that. I have an idea it might be a foot of that strung along there, mostly pretty good sized rocks. On the north side there was a smaller shoulder of gravel, and there was quite a—oh it was, I don't know how many feet from there to the fence. It was more of a gradual barrow pit than on the south side.

"Q Getting back to the south side of the road and the shoulder along it, had the rock or gravel been levelled out?

"A No.

"Q Were there piles of rock there?

"A Some.

"Q How about the north side?

"A It seemed there was more—It was more level there it seemed, or had scattered down further into the barrow pit."

Carl Driskill, a funeral director and also county coroner, as a witness for plaintiffs, described the injuries to the body of decedent as follows:

"A The nature of the injuries were—compound fracture of the left arm, a compound fracture of the skull, and multiple internal injuries. That just about covers it."

Sheriff Damon was recalled for further cross-examination and testified as follows:

"Q Mr. Damon, I am not clear in my mind whether or not you placed the first blood that you saw as being north of the yellow line or south of the yellow line?

"A South of the yellow line.

"Q Did you find any blood at all for the distance of the skidmarks, or before the skidmarks began, on the easterly edge of the skidmarks, to the north of the yellow line?

"A I never found any blood at any time north of the yellow line.

"Q At no place?

"A No.

"Q Where was this glass, with reference to the yellow line?

"A It was just a little bit south; well, practically on the yellow line.

"Q And some of it south?

"A A little of it barely over the yellow line. It was lying almost exactly in the middle of the road.

"Q And how much of a space, about, did it occupy? ·

"A Oh, I suppose you could have covered it all with a two foot circle.

"Q These black marks, as you looked at them, did it show a hard application of brakes, or would you say an easy application of them?

"A I would say the brakes were put· on hard enough to—I would say.the wheels were not sliding. It was leaving a fairly definite mark, but the wheels weren't sliding.

"Q Well, would it be—would you say it was a harsh application or just an ordinary application?

"A I would say it was a steady application."

The evidence also reveals that decedent and his wife had planned to attend a dance being held that night in Dayville. A friend had agreed to call for them and take them to the dance in his car. Decedent owned no car. After waiting in vain until nearly 10 p.m. for the arrival of the friend, decedent decided to walk to Mt. Vernon for the purpose of procuring transportation there for himself and wife. Shortly after he left his home, the accident occurred.

The foregoing constitutes all the material evidence introduced by plaintiffs respecting the accident itself and the physical facts connected therewith. It is obvious from the testimony of the witnesses that the so-called "skidmarks" made by defendants' car were not true skidmarks (where the wheels of the car slide), but were more in the nature of tire marks made by the gradual, rather than abrupt, application of brakes. The tire marks in question ran in a straight line for a considerable distance before the car was stopped. All of

said marks were at least two feet to the right, or north, of the center line of the pavement. From that, it is manifest that the car was on its own side of the road at all times.

Viewing the foregoing evidence in the light most favorable to plaintiffs, and giving to them the benefit of every reasonable inference which may be drawn therefrom, we are of the opinion that the motion for an involuntary nonsuit should have been allowed upon either or both of the grounds assigned therefor by defendants. Those grounds were:

"1. The plaintiffs' own evidence clearly discloses contributory negligence on his [decedent's] part as a matter of law.

"2. The evidence wholly fails to show that defendant Margery Holland was guilty of negligence in any of the particulars set forth in plaintiffs' complaint."

We do not give our reasons for that conclusion now, but will do so in discussing the action of the trial court in overruling plaintiffs' motion for a directed verdict. Defendants did not rest upon denial of their motion for a nonsuit, but produced evidence on their own behalf. Under the law, if any of that evidence is of benefit to plaintiffs in establishing their cause of action, they are entitled to it, and we must, therefore, consider all the evidence in the record in determining the question whether the trial court erred in denying plaintiffs' motion for a directed verdict.

There was very little, if any, evidence produced by defendants that aided plaintiffs' cause. That evidence is summarized in plaintiffs' brief substantially as follows:

"As the defendant Margery Holland proceeded westerly down the highway immediately prior to

the accident, the McKinney car approached from the opposite direction, driving easterly from Dayville toward Mt. Vernon. Following behind the Holland car and proceeding in the same direction was a car operated by an Indian. These two vehicles were close together as they passed through Mt. Vernon— so close that there was not time for the car driven by the witness Sharp to pull out between them. However, by the time they had reached the scene of the accident (a distance of only half a mile), the Indian's car * * * had been left far behind.

"The McKinney car, when still a considerable distance from the Holland vehicle, dimmed its headlights and shortly thereafter Margery Holland dimmed her lights and then immediately, or as Mr. McKinney described it, 'just instantly', she struck the plaintiff's decedent. Although Margery Holland insists that she did not see the decedent until the very instant of impact, 'just as I felt the impact I saw the object', *the skidmarks commenced thirty feet easterly from the point of impact,* indicating that she was braking her car with sufficient force to leave skid marks on the highway *thirty feet* before she struck the decedent.

"Apart from Margery Holland, there were no real eye witnesses that could be produced. Mr. McKinney and his wife merely saw the headlight go out, but were too far away to observe any details; the Indian was also too far behind by then to observe anything and left the scene of the accident before anyone could secure his name or address." (Italics ours.)

Defendant Margery Holland gave her version of the accident as follows:

"Q As this other car approached you, Margery, just go ahead and tell the jury what you did and what you saw.

"A As I was coming down the straightaway and saw this other car approaching—I knew it

was coming before it come over the rise, because you can see the headlights flash over the rise into the sky. As it came over the rise, and he had come a little distance, he dimmed his lights, and I dimmed mine; and almost immediately I saw this yellowish, brownish object; just as I felt the impact I saw this object. And I didn't know what it was. I saw it fly off to the side of the road. I knew this other car was approaching. I had my foot on the brake. I wasn't conscious how hard I was brakeing. I was going down the road, and knew the other car was coming, and knew I had to keep under control. I gradually kept my car on the side of the road, and gradually stopped, and then after I stopped, this other car had come up to me and pulled in over toward me, toward this object in the road. Then it went on and parked behind this object on the road a little ways up, and I found out it was Mr. Mc-Kinney. He came down to where this object lay, and went to his car. I had not gotten out of my car. He came back to the car; and I asked what I had hit and he told me. He asked how fast I was going and I said, 'Between fifty and fifty-five miles an hour.' After that I told him, I kept telling him, I didn't see it; and asked him what was going to happen, and he said it would be rough. Then he went back, and I don't know where; and I sat there in the car; and I don't remember much until Mr. Damon's daughter came and told me to go back with her.

"Q Do you remember whether or not you backed up your car?

"A Yes. Mr. McKinney came to me and said, 'Better back your car up a little bit.' I started to back up, and I had gone just a little distance, and said, 'It won't go, Mac'; and he said, 'O.K., leave it there.' "

It will be noted that in the statement we quoted from plaintiffs' brief, it is asserted that "the skid-marks commenced *thirty feet* easterly from *the point*

*of impact"*. This statement assumes that the "point of impact" is established by the evidence. It is not so established. In truth, the actual point on the highway where the car struck decedent is indefinite. One witness found a blood spot on the yellow line about 12 or 13 feet from the point where the tire marks started, but even that would not definitely mark the point of impact. To locate the point of impact one must necessarily indulge in pure speculation. Plaintiffs seek to fix it at the point where the headlight glass was found on the highway, approximately 30 feet westerly from the beginning of the tire marks; that is the basis of their assumption. They contend that, when broken, the glass immediately fell to the ground. The photograph of the Holland car taken at the time shows a dent on the upper left corner of the hood, to the right of the left headlight. There are no marks or dents on the left front fender. From that, it is very evident that decedent came in contact with that portion of the front of the car, which included both the headlight and hood. The break in the glass of the headlight is on the side toward the hood; some glass remained on the outer portion of the headlight. The left front wheel of the car is located slightly to the left of and under the headlight. At the time of the impact, wherever it may have occurred, that left front wheel (as shown by the tire marks) was from two to two and one-half feet north of the center line of the road. It is manifest, therefore, that the actual impact must have occurred at least three feet north of the center line, yet the glass was found on and to the south of the center line. To fix the location of the glass from the standpoint of an easterly and westerly direction as the point along the highway where the impact occurred would require a finding that when decedent's body struck and

broke the glass in the headlight, the glass was thrown directly and immediately to the left of the moving car for a distance of three or four feet. Obviously, such a finding would be highly speculative, when the momentum of the car is considered, together with the fact that decedent's body must have been against the headlight glass for a brief instant at least. At 55 miles per hour, the rate of speed of the Holland car as testified to by Margery, the car was traveling approximately 80 feet per second. At such a speed, split seconds count when from the physical facts alone attempt is made to reconstruct the exact place where the impact occurred. Point of impact is not so difficult to establish where two motor vehicles collide. In such cases it is frequently possible to locate the point of impact with a high degree of certainty, but it is entirely different when a rapidly moving automobile strikes a pedestrian.

■ To fix liability in an action of this nature two things must concur and combine: (1) an act of negligence on the part of defendant; and (2) such act of negligence must be a proximate cause of the injury. If either of these elements is missing, there can be no liability. To warrant a recovery of damages, each and both of these constituents of a cause of action must be established by a preponderance of evidence. It is not necessary that the cause of action be established by direct evidence; it may be established by circumstantial evidence. However, the burden of proof is upon the plaintiff to prove his case. *Owens v. Holmes,* 199 Or 332, 337, 261 P2d 383; *Quetschke, Adm'x v. Peterson and Zeller,* 198 Or 598, 606, 258 P2d 128; *Wintersteen v. Semler,* 197 Or 601, 620, 250 P2d 420, 255 P2d 138, 140; *Paddock v. Tone,* 25 Wash2d 940, 172 P2d 481; 3 Jones, Evidence 4th ed, 1680, § 899.

In *Owens v. Holmes,* supra, we said:

"To recover in this case, it was incumbent upon plaintiff to establish by a preponderance of satisfactory evidence one or more of the specific acts of negligence charged against defendant, and that such negligence proximately caused her injuries. It is not necessary to establish negligence by direct and positive evidence; it may be established by circumstantial evidence. But where proof of negligence depends entirely upon circumstantial evidence, as here, it is necessary that the essential facts in the chain of circumstances be established by a preponderance of satisfactory evidence before a jury is entitled to draw any inference therefrom; the facts so established must be such that from them a reasonable inference of negligence may be drawn, and further, that the negligence so inferred was the proximate cause of the injury. When the evidence shows two or more equally probable causes of injury, for not all of which defendant is responsible, no action for negligence can be maintained."

Plaintiffs charged defendant Margery Holland with negligence in the following particulars: (1) in driving her vehicle at the high, reckless and dangerous rate of speed of more than 70 miles per hour in violation of the basic rule (ORS 483.102 to 483.112); (2) in failing to keep and maintain her car under proper or any control; and (3) in failing and neglecting to keep and maintain a proper lookout.

Margery Holland testified that she was traveling at a rate of speed of 55 miles per hour. The only evidence claimed by plaintiffs as contradicting that rate of speed, and establishing a rate of speed of 70 or more miles per hour, is the evidence as to the following physical facts: length of tire marks along the pavement; the severe injuries to decedent's body; the distance decedent's body was carried and thrown by

the moving car; the distance that grew between the Indian's car and the Holland car between Mt. Vernon and the scene of the accident (there is no evidence as to the speed the Indian was traveling, nor as to whether he stopped along the way); and the debris (broken glass, blood, and brains on the highway). Plaintiffs contend that the rate of speed may be determined from the physical facts, and cite in support of their contention the following authorities: *Cowgill, Adm'r v. Boock, Adm'r*, 189 Or 282, 290, 218 P2d 445; *White v. Keller et ux.*, 188 Or .378, 384, 215 P2d 986; *Cameron v. Goree*, 182 Or 581, 602, 189 P2d 596; *Greenslitt v. Three Bros. Bak. Co.*, 170 Or 345, 348, 133 P2d 597; *Wilbur v. Home Lbr. & Coal Co. et al.*, 131 Or 180, 183, 282 P 236; *Castro v. Hansen*, 123 Or 20, 27, 261 P 428; *Asumendi v. Ferguson*, 57 Idaho 450, 65 P2d 713; 5 Am Jur 850, 852, Automobiles, §§ 630, 633.

■ It would require pure speculation for a jury to find from the physical facts in evidence in this case that defendant Margery Holland was driving at a rate of speed of 70 miles per hour, or at any greater rate of speed than that to which she testified. It is just as reasonable to suppose that all of the circumstances referred to could have occurred with the car traveling at a rate of 55 miles per hour, or even at a much lesser speed. A rate of 55 miles per hour is a very rapid speed itself. Under some conditions it might be deemed an excessive rate of speed, just as lesser rates of speed might be so deemed in certain circumstances. But the rate of speed in miles per hour at which the defendant was traveling is not the important consideration. In every case where speed is involved as an element of negligence in the operation of an automobile, the question is primarily whether such speed was excessive

under all the facts, circumstances, and conditions existing at the time, and not how fast the automobile was traveling in specific miles per hour. *Bailey v. Rhodes, Adm'r,* 202 Or 511, 523, 276 P2d 713. That is the question which was involved in the above cases cited by plaintiffs.

■ The indicated speed of an automobile along the highway where this accident occurred is 55 miles per hour. ORS 483.104. Any speed in excess of that rate is prima facie evidence of the violation of the basic rule, but traveling in excess of a designated speed is not necessarily a violation of the law. It becomes so only when, while so traveling, the basic rule itself as to speed is violated. It is the violation of the basic rule as to speed, and not merely traveling in excess of the designated speed, that is unlawful. Designated speeds are not "speed limits". With certain exceptions there are no "speed limits" as such under the statutes of this state. *Burrows v. Nash,* 199 Or 114, 120, 259 P2d 107; *Rauw v. Huling and Sparks,* 199 Or 48, 55, 259 P2d 99. Therefore, had the defendant been traveling at a rate of speed in excess of 55 miles per hour, she would not necessarily have been guilty of negligence. She could only be found guilty of negligence in such circumstances if, in so traveling, she violated the provisions of the basic rule in some respect. The basic rule is as follows:

"No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway and the hazard at intersections and any other conditions then existing.

"Nor shall any person drive at a speed which is greater than will permit the driver to exercise proper control of the vehicle and to decrease speed or to stop as may be necessary to avoid colliding

with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and with the duty of drivers and other persons using the highway to exercise due care * * * ''

■ The defendant Margery Holland was traveling upon a comparatively wide, paved highway and along a straight stretch thereof. The place was a country district, and there were no intersecting streets or highways. The pavement was dry and its center line was clearly marked with a yellow stripe. She was driving on her own side of the road. The lights on her car were in good working condition and the brakes efficient. She was not required to anticipate negligence on the part of any other person and had the right to assume until she had notice to the contrary or in the exercise of due care on her part should and would have known to the contrary, that all other persons using the highway would exercise due care and obey the law. *Walker v. Penner,* 190 Or 542, 227 P2d 316. It is elementary that negligence on her part could not be assumed from the mere happening of the accident. The accident occurred at a place where pedestrians are required to walk upon their left-hand side of the roadway facing approaching traffic (ORS 483.220), and are prohibited from crossing the same without first yielding the right of way to all vehicles upon the highway (ORS 483.210 (4)). The defendant, while operating her car, could not reasonably be expected, nor was she required, to anticipate that any pedestrian would be in any but his own proper place on the road, or that he would fail to yield the right of way. The primary purpose of ORS 483.220, supra, is to make certain that pedestrians see approaching traffic proceeding toward them so as to be able to step aside to or

remain in a place of safety. When all is said and done, the paved portion of a highway, except at cross-walks, is designed primarily for the use of vehicles. That is why we have definite statutory rules as to cross-walks and rights-of-way. We can find no direct or circumstantial evidence in the record from which it might reasonably be determined that defendant was traveling at an excessive rate of speed in violation of the basic rule at the time and place in question.

Furthermore, it is manifest from the facts in the case that whatever the speed of the car may have been, it had nothing to do with the proximate cause of the accident.

 We also are of the opinion that there is no evidence in the record, direct or circumstantial, from which it might reasonably be found that the defendant did not keep a proper lookout, or that she failed to have her car under control. The dimming of her lights shows conclusively that she was looking ahead on the highway; that is also demonstrated by the straight line of travel which she maintained. The gradual application of her brakes and the stop she made shows that she had control of the car; she kept it going straight ahead upon her own side of the road. These are physical facts which corroborate the defendant's oral testimony. As against this we have only speculation and conjecture on the part of plaintiffs. Verdicts of a jury must be based upon substantial evidence, not upon speculation.

Other than the defendant Margery Holland, there was no eyewitness to the accident. She didn't see the decedent until immediately after she dimmed her lights, and then saw him only as "an object" which came in contact with her car. There is no evidence whatever as to where the decedent came from; whether he was

walking, running, or standing still; if walking (or running), in which direction or on what part of the road he was proceeding except at the very instant of impact, and at that moment he was on defendant's side of the road, about three feet from the center line. How he got there, or in which direction he was facing, no one knows. The evidence shows that he was mentally alert and in good physical condition. Two cars were approaching from opposite directions, their headlights shining. He must have seen at least the one which he happened to be facing at the time, and in the exercise of due care on his part should have seen the other before placing himself in the line of travel of either. It is pure speculation to say that he saw defendant's car and misjudged its speed, because in order to indulge in that speculation one has further to speculate as to just where he was on the highway when he made that mistake.

There is very little difference between the essential facts and circumstances of this case and those prevailing in the case of *Owens v. Holmes,* supra. The fact that a child was involved in the Owens case instead of an adult is not material insofar as the instant case is concerned. In this case the plaintiffs wholly failed to sustain the burden of proof resting upon them. *Brooks v. Morgan,* 331 Pa 235, 200 A 81; *Cloyd v. Wills,* 180 Md 161, 23 A2d 665.

■ Furthermore, from the known facts and circumstances in this case, it is manifest that decedent was guilty of contributory negligence as a matter of law. His being where he actually was at the time and place of the impact cannot be explained or excused under any reasonable theory. Wherever he was immediately prior to the accident he could see the approaching cars. If, as has been suggested, he might have been hurry-

ing from the north side of the road to the south side to intercept the McKinney car with a view to getting a ride into Mt. Vernon, he would still have been guilty of contributory negligence. He was a pedestrian, with the ability to step aside from an approaching automobile, or to remain still in a place of safety. He was under a duty to yield the right of way to the approaching cars. Had he given due heed and taken the precautions which a reasonably careful and prudent person would have taken under like circumstances, it is inconceivable that the collision could have occurred.

There is nothing in the record from which it might reasonably be inferred that decedent was free from contributory negligence. Therefore, as to decedent's contributory negligence, there was no question of fact for determination by the jury. *Schillinger v. Wyman,* 331 Mich 160, 49 NW2d 119; *Tomchak v. Poland,* 185 Wash 101, 52 P2d 1262.

■ Plaintiffs contend that there was a question of fact for determination of the jury upon the matter of decedent's alleged contributory negligence because of the presumption that he exercised due care. This presumption is based upon the assumption that there is, in man, an instinct of self-preservation and the natural desire to avoid pain and injury to himself. Yet that presumption alone is not sufficient to make a case for the jury where, as here, the physical facts and the other facts and circumstances in evidence establish beyond all reasonable doubt the contrary. *Moore v. Esso Standard Oil Co.,* 364 Pa 343, 72 A2d 117; *Goodloe v. Jo-Mar Dairies Co.,* 163 Kan 611, 185 P2d 158.

In 2A Blashfield, Cyc. of Auto. Law & Practice 288, § 1415, it is stated:

"A pedestrian on the highway at night on whichever side he walks must exercise ordinary care, in

the situation in which he puts himself and under the circumstances surrounding him. The degree of caution which constitutes ordinary care varies with the circumstances, and the greater the apparent danger the greater the degree of caution.

"So one who uses the roadway without taking any precautions for his own safety, though he can see the lights of an automobile which strikes him long before it reaches him, is guilty of contributory negligence barring recovery for the injury received. The act of walking down the middle of a highway on a dark night in a populous city is one from which negligence may be inferred."

This was a sad and unfortunate accident. What consideration placed decedent in a place of danger no one knows, or possibly could know. Whatever caused him to put himself in a position directly in front of a rapidly moving motor vehicle is a problem that will never be solved. His lips are sealed in death and only the facts and circumstances tell his story. That story is clearly one of contributory negligence.

Not only should the motion for an involuntary nonsuit have been sustained, but also the request for a directed verdict, and the motion for a judgment in favor of defendants notwithstanding the verdict.

The judgment is reversed and this cause remanded with directions to enter judgment for defendants.

## ON REHEARING

RESPONDENTS' PETITION FOR REHEARING

*Grant & Fuchs,* and *Gene C. Rose,* of Baker, attorneys for appellants.

*Banta, Silven and Horton,* of Baker, and *Wilson & Olsen,* of John Day, for the petition.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK and PERRY, Justices.

TOOZE, J.

Plaintiffs have filed a petition for rehearing alleging that we erred in several of the conclusions reached by us in our original opinion handed down June 8, 1955.

Plaintiffs' principal complaint is directed to our conclusions respecting the absence of substantial evidence to support the allegations of negligence made against defendants. Our attention is again called to the testimony in the record, and to the inferences which plaintiffs claim may reasonably be drawn therefrom, to sustain their contention originally made and ably presented in their brief, and now repeated, that there is substantial evidence to support the verdict.

We carefully scrutinized and considered the entire record before arriving at our conclusions. Everything now called to our attention in plaintiffs' brief in aid of the petition for rehearing was fully evaluated upon our original consideration of the matter. We find nothing new that causes us to revise our views as originally expressed.

The inferences necessary to support the charges of negligence, and to which plaintiffs again direct our attention, are inferences based largely upon speculation, and not upon established facts. As the basis for the inferences necessary to be drawn to make out a case, plaintiffs do and must rely upon the erroneous premise that the point of impact on the highway is definitely established by the evidence.

As we pointed out in our original opinion, the point

of impact is not so established. It is conceded that the location of the broken headlight glass and radio aerial on and to the south of the center line of the highway at a point 30 feet westerly from where the tire marks of defendants' car commenced is definitely established as a physical fact, although such physical fact rests upon the oral testimony of sheriff Damon, plaintiffs' principal witness. It also is an undisputed physical fact that the tire marks made by the left wheels of defendants' motor vehicle ran in a straight line westerly for more than 200 feet, and that they were on the north or right side of the highway, two feet from the center line thereof. Of course, this physical fact also rests upon the testimony of sheriff Damon, corroborated by that of the witness Green, but there is nothing whatever in the record to dispute it, either by way of direct evidence or by any reasonable inference that might be drawn from the evidence produced. It accords with the positive testimony of the driver of defendants' vehicle. Further, it is a physical fact that the impact between the automobile and the body of decedent occurred on that part of the front of the car between the right side of the left front headlamp and the left front side of the hood. There was a dent on the hood of the car, and no dents elsewhere; in particular, there were no marks or dents on the left front fender. These facts are shown by the photograph of the front of the car taken by sheriff Damon within a short time after the accident.

Therefore, in the light of these known facts, and as we said in our original opinion, a determination that the location of the broken glass and radio aerial on the highway marked the exact point easterly and westerly on the road where the impact occurred as claimed by plaintiffs could be reached only by a highly specula-

tive and unreasonable inference. To so conclude would necessarily be the result of mere guesswork. Purely speculative inferences or conclusions do not constitute substantial evidence. *Lynch v. Clark et al.,* 183 Or 431, 440, 194 P2d 416.

As we originally pointed out, the physical facts in this case demonstrate beyond any question that the impact occurred at least three feet north of the center line of the highway; the broken glass and radio aerial lay on and to the south of the center line. How this debris got there no one knows, nor could know, except that it was thrown by and from the rapidly moving vehicle at some moment following the impact. When decedent's body was thrown from contact with the car, it was thrown in a diagonal direction (southerly and westerly) to the south edge of the pavement, although the automobile kept moving in a direct line westerly. It may be that the glass and radio aerial were also so thrown. Many speculative conjectures might be made as to just what happened, and how it happened, with one guess as good as another, but actions for negligence are not determined by mere guesswork.

Plaintiffs invite our attention to the following portion of our original opinion:

"* * * To fix the location of the glass from the standpoint of an easterly and westerly direction as the point along the highway where the impact occurred, would require a finding that when decedent's body was struck and broke the glass in the headlight, the glass was thrown directly and immediately to the left of the moving car for a distance of three or four feet."

and in their brief say:

"We agree with the Court that 'obviously, such a finding would be speculative'. We will go further

and state that in our opinion, it would be most unlikely, in fact well nigh impossible for the glass to be thrown in that manner. So far as respondents are concerned, they have never so contended. * * *.

"As we view it, the situation is as follows: The testimony of Damon that the nearest skidmarks were 'about two feet' north of the yellow line, is in the record. His testimony that the radio aerial and the broken headlight glass were found in a compact body exactly on or a little south of the yellow line, is also in the record. It is our belief that since no exact measurements were made, Mr. Damon was more probably in error when testifying regarding the location of the skid marks, than as regards the location of the headlight glass & other debris. Disregarding this, however, *these two statements are inconsistent with each other.* Both could not be correct and it was for the jury to determine which was the truth and which represented an error in recollection. This Court can, we submit, no more say that the location of the skid marks as testified to was correct and that the decedent was struck at last three feet north of the center line, *thereby disregarding the headlight glass and radio aerial,* than it could disregard the skid marks and say conclusively, as a matter of law, that the glass and radio aerial marked the point of impact and that the decedent was struck on or south of the yellow line. *It was for the jury, and the jury alone, to determine which was the true situation.*"

Plaintiffs are in error when they say no measurements were made. With a tapeline, and assisted by Green, Damon made exact measurements of the tire marks and other distances involved.

Furthermore, plaintiffs are in error when they say there is an inconsistency between the statements of Damon respecting the location of the debris and the location of the tire marks. Obviously both statements may be true. There is no evidence in the record to

dispute either, nor is there any evidence in the record from which a reasonable inference might be drawn that one or the other of such statements is false. The facts testified to were physical facts; they were facts open to view by anyone. They were testified to positively by Damon, a distinterested witness, and they were not contradicted. The testimony of Damon was not inherently improbable, incredible, nor contrary to physical facts or common observation and experience, and was based upon actual observation and investigation in his capacity as an officer of the law. In such circumstances, neither the jury nor this court would have the right to speculate upon whether one or the other of the statements is untrue, or disregard either. 20 Am Jur 1030, Evidence, § 1180. Had the statements been inconsistent in fact, then we agree that it would have been the sole province of the jury to determine wherein lay the truth.

Moreover, we cannot agree with plaintiffs that if Damon made an error in his location of either the debris or the tire marks, it is more likely that he erred as to the tire marks. In our opinion, the reverse would be true. As an investigating officer, Damon certainly would be primarily concerned in the movements of the automobile causing the death, rather than in the exact location of the debris on the highway. However, that is relatively unimportant to the decision in this case.

In our original opinion, we did not discuss the "stopping within range of vision" doctrine, deeming such discussion unnecessary to our decision. However, the question was presented to us in the briefs of the parties in connection with an instruction given the jury. In their brief in support of the petition for rehearing, plaintiffs again raise the question. They do

so in arguing the reasonableness of some of the inferences they seek to draw from the established facts.

Although in some jurisdictions it is the law that a driver of a motor vehicle is guilty of negligence as a matter of law if he drives at a rate of speed that will not permit him to stop within the range of his vision, it is not the law of this state. In *Alt v. Krebs,* 161 Or 256, 261, 88 P2d 804, Mr. Justice Lusk, speaking for the court, said:

> "It is further argued that the plaintiff was negligent because, under her own testimony, she was unable to stop her car and so avoid a collision with the defendant's car after she saw it thirty feet ahead of her; that this evidence manifests that she was driving at an excessive rate of speed under the circumstances, was not keeping a proper lookout, and did not have her automobile under control. [Plaintiffs make somewhat the same argument in the instant case.] But this is only another way of saying that it is negligence as a matter of law to drive an automobile at such a rate of speed that it cannot be stopped within range of the driver's vision—a doctrine definitely rejected by this court in Murphy v. Hawthorne, supra [117 Or 319, 244 P 79, 44 ALR 1397]."

Mr. Justice Belt wrote the opinion in *Murphy v. Hawthorne,* supra. He also wrote the opinion in the later case of *French v. Christner,* 173 Or 158, 173, 135 P2d 464, 143 P2d 674. In this latter case, Justice Belt quoted with approval the following from 5 Am Jur 648:

> "Without denying that in many situations and under many conditions a driver of an automobile is as a matter of law guilty of negligence in driving at such a rate of speed as prevents stopping within time to avoid an obstruction within the range of his vision, there is a strong tendency in the recent cases to refuse to adopt that as a universal formula or a hard and fast rule. Thus, it has been held to

have no application in case of emergencies creating unexpected hazards. *The rule does not apply to a case where an object or obstruction which the driver has no reason to expect appears suddenly immediately in front of his automobile * * *.''* (Italics ours.)

In this case, the evidence is wholly silent as to whether the decedent was within the lane of travel of the Holland car a sufficient distance or a sufficient time ahead to make it possible for the driver to avoid striking him. The driver did not see him until immediately prior to the impact, although the lights on her car were burning and she was looking ahead on the highway. It is just as reasonable to infer that decedent suddenly and unexpectedly appeared in front of the moving vehicle as it is to infer that he was in the line of travel of the car a sufficient distance or sufficient time ahead to make it possible for the driver to avoid hitting him. It must be kept in mind that we are now considering the question of alleged negligence on the part of defendants. The presumption of due care on decedent's part is of no avail in establishing such negligence. In 9B, Blashfield Cyc. of Automobile Law and Practice 511, § 6051, it is stated:

"The presumption of the exercise of due care merely negatives contributory negligence, and does not compel the conclusion that the other person involved in the accident was negligent."

In 16 Am Jur 207, § 302, the rule is stated thus:

"Negligence on the part of the person injured and killed is ordinarily not presumed; he is presumed, on the contrary, to have exercised due care for his own safety at the time of his injury. This presumption is indulged, however, only to relieve a plaintiff from an inference of negligence *and not to supply evidence of the negligence of a defendant.*

> *Moreover, the circumstances surrounding the mishap may be such as to rebut the presumption of due care and even to raise a presumption of contributory negligence on the part of the person killed."*
> (Italics ours.)

■ There is also a presumption in favor of defendants that they exercised due care, and the burden is upon plaintiffs to overcome that presumption by substantial evidence. Plaintiffs' difficulty in this case rises from a lack of evidence, direct or circumstantial, to establish the necessary negligence on the part of defendants. *Paddock v. Tone,* 25 Wash2d 940, 172 P2d 481.

As stated, there is nothing in the record to show that decedent was in view long enough for Margery Holland to have seen and avoided him. To say that he was in sight long enough is merely conjecture. There is nothing in the evidence to show whether decedent was walking on the paved portion of the highway toward the approaching car, or whether he was walking diagonally or directly across the road, or whether he was standing still, sitting down, or stooped over, or whether he was in the act of rising to his feet after having fallen to the pavement for some unknown cause or the other. How long and where he was on the road before being struck is unknown, and there is no way of knowing it, so it would require pure speculation to find that he was there a sufficient length of time for Margery Holland to see and avoid colliding with him.

In pointing out inferences which it is claimed might reasonably be drawn by a jury from the established facts in the case as a part of a discussion of the "range of vision rule", particularly as respects the charges of negligence based upon speed and lookout, plaintiffs rely in large measure upon a chart appearing at page

413, Vol. 9C, Blashfield Cyc. of Automobile Law and Practice. This chart purports to set forth the distances a car equipped with brakes in excellent condition may be stopped when travelling at certain rates of speed. The chart allows a certain distance for reaction time of the driver after the necessity for the application of brakes arises, and in each speed category gives the overall distances required for stopping. For example, at a rate of speed of 50 miles per hour, a forward distance of 55 feet is allowed for reaction time to set the brakes, and then 111 feet is fixed as the stopping distance, or a total of 166 feet of travel after the emergency arises.

■ Unquestionably, this chart is based upon experiments conducted with different motor vehicles and drivers at different times and places. As a general proposition, the information on the chart might be of value in the driving education of motor vehicle operators, but it serves no purpose in a case such as this. The figures on the chart are not evidence in this litigation, nor could the chart itself have been admitted in evidence. Insofar as this case is concerned, the information given is pure hearsay. *Tuite v. Union Pacific Stages,* 204 Or 565, 284 P2d 333, 341. Moreover, in any negligence case, the information contained in the chart would be of no value, unless the experiments giving rise to the figures or estimates were first shown to have been performed under conditions substantially similar to those present at the time and place involved in the controversy. *Tuite v. Union Pacific Stages,* supra; 2 Belli, Modern Trials 1023, § 180. There are so many factors that enter into motor vehicle stopping distances as to make any fixed formula of slight, if any, value in a given case. Condition of tire tread, weight of the vehicle, type and condition of brakes,

force with which brakes are applied, the type and condition of the roadway, and the differences in reaction time among individual drivers, are but some of those factors. In the instant case, defendants made no attempt to stop the car within the shortest distance possible or practicable. As shown by the type of tire tracks. made by the car, and as testified to by Margery Holland, the application of the brakes was not made with full force, nor was any attempt made to bring the car other than to a gradual stop. The deductions plaintiffs make, based upon the information contained in the chart in question, are of no aid to them in this case.

Plaintiffs complain that in our original opinion "appears what seems, on its face at least, a rather startling statement." The statement referred to is:

"There is nothing in the record from which it might reasonably be inferred that the decedent was free from contributory negligence. Therefore, as to decedent's contributory negligence there is no question of fact for determination by the jury."

We agree with plaintiffs that this statement, if read alone, might cause some confusion. However, it should be read in the light of the paragraph of the opinion immediately preceding where we said:

"Furthermore, from the known facts and circumstances in this case, it is manifest that decedent was guilty of contributory negligence as a matter of law. His being where he actually was at the time and place of the impact cannot be explained or excused under any reasonable theory. Wherever he was immediately prior to the accident he could see the approaching cars. If, as has been suggested, he might have been hurrying from the north side of the road to the south side to intercept the McKinney car with a view to getting a ride into Mt. Vernon, he would still have been guilty of contributory negligence. He was a pedestrian, with the ability to

step aside from an approaching automobile, or to remain still in a place of safety. He was under a duty to yield the right of way to the approaching cars. Had he given due heed and taken the precautions which a reasonably careful and prudent person would have taken under like circumstances, it is inconceivable that the collision could have occurred."

As to the above statement to which their complaint is directed, plaintiffs say:

"This statement seems to clearly imply that the Court is attempting to shift the burden of proof on contributory negligence in Oregon, from the defendants, where it has always been, onto the plaintiffs."

■ We fear that if plaintiffs have been misled as to what we intended, others may also misunderstand, so we take this opportunity of saying that we had no intention of changing or in any way modifying the well-established rule in this state that contributory negligence is an affirmative defense and, in establishing the same, the burden of proof is upon the defendant.

■ However, under the established facts of this case, we are firmly convinced that decedent was guilty of contributory negligence as a matter of law. 16 Am Jur 207, § 302, supra. There is no evidence whatever respecting the actions of decedent immediately prior to the impact. All that is known is that at the instant of impact he was perhaps in an upright position on the highway, approximately three feet north of the center line thereof. In the light of the known facts and the applicable law of this case, and in the total absence of evidence, direct or circumstantial, to explain or justify decedent's presence on the pavement at the time and place he was struck by the rapidly moving vehicle, if indeed it would be possible to give any reasonable explan-

ation, the conclusion is inescapable that decedent was guilty of contributory negligence. The presumption of due care cannot save him from that finding as, under the known facts and circumstances of this case, that presumption is overcome as a matter of law. On this straight stretch of highway in wide-open country where the headlights of approaching automobiles could be seen for long distances, it is inconceivable that a pedestrian could be hit by one traveling in a straight line on its own side of the road if he exercised even the slightest degree of care for his own safety.

■ As the basis of liability in all cases of this type, the existence of negligence and proximate cause is determined by the conditions prevailing immediately prior to and at the moment and place of impact, and not in the light of subsequent events, and these conditions must be established by substantial evidence, direct or circumstantial, and not by mere surmise. *Owens v. Holmes,* 199 Or 332, 261 P2d 383; *Quetschke, Adm'x v. Peterson & Zeller,* 198 Or 598, 258 P2d 128; *Wintersteen v. Semler,* 197 Or 619, 620, 636, 250 P2d 420, 255 P2d 138.

In arriving at our conclusions we have not overlooked the allegations of plaintiffs' complaint and the admissions in defendants' answer that prior to the impact decedent was walking upon the highway. Such fact in no way affects the result.

We adhere to our original opinion. The petition for rehearing is denied.