Argued April 7, reversed September 24, petition for rehearing
denied November 12, 1969, second petition for rehearing
denied January 27, third petition for rehearing
denied February 17, 1970

FRANCIS, *Respondent, v.* BURNS ET AL,
*Appellants.*
458 P. 2d 934

*Daryll E. Klein,* Portland, argued the cause for appellants. With him on the briefs were McMenamin, Blyth, Jones & Joseph.

*Donald C. Walker,* Portland, argued the cause and filed a brief for respondent.

Before PERRY, Chief Justice, and McALLISTER, O'CONNELL, DENECKE and LANGTRY,[*] Justices.

McALLISTER, J.

This is a damage action for personal injuries sustained by plaintiff when his pickup collided with a station wagon owned by the defendant Burns and operated by the defendant Roger Campbell. The jury returned a verdict for plaintiff and defendants appeal. We will refer to Campbell as if he were the only defendant.

The question in this court is whether defendant's motion for a directed verdict should have been allowed, i.e., whether there was substantial evidence to support the jury's finding that defendant was negligent.

The collision ocurred at the intersection of Highway 26 and Kelso Road in Clackamas County at about noon on a clear, dry day. The witnesses to whose testimony we shall refer assumed that Highway 26 ran east and west and Kelso Road north and south. Highway 26 was a through highway with stop signs directing traffic on Kelso Road to stop before entering the intersection.

Plaintiff testified that he was driving south on Kelso Road, that he stopped at the stop sign and then

---

[*] Langtry, J., did not participate in the decision of this case.

proceeded into the intersection. He said he could not remember anything that happened thereafter. Defendant testified that he was driving east on Highway 26 at about 40 to 45 miles per hour, that plaintiff's vehicle drove into his path when he was so close that he did not have time to slow down or take any evasive action. The left front of defendant's vehicle and the right front of plaintiff's vehicle collided in defendant's lane of travel.

Plaintiff alleged that defendant was negligent in driving at an excessive speed, in failing to maintain proper lookout and control and in failing to stop, swerve, or turn, after discovering that plaintiff was crossing Highway 26.

A state police officer testified as a witness for plaintiff that the indicated speed for cars traveling on Highway 26 was 55 miles per hour and the court so instructed the jury. Defendant's testimony that he was driving at a speed of 40 to 45 miles per hour and that he "let up on the gas" as he approached the intersection was not contradicted.

Plaintiff contends, however, that the jury could have inferred negligence by defendant from the damage to the two vehicles and other evidence of a violent impact. The evidence on which plaintiff relies is listed in his brief as follows:

1. The collision caused a loud noise like an explosion.

2. The station wagon ended up under the canopy of the Trading Post. (A store at the southeast corner of the intersection about 50 feet from the point of impact.)

3. The pickup was turned completely around. One of the occupants had gone through the windshield and then came back inside. . . . .

4. Transmission oil was on the pavement.

5. Defendant was thrown clear of the station wagon.

6. A sign was knocked forward.

7. A picture showing the damage to the station wagon.

8. A picture showing the damage to the pickup.

9. Gouges in pavement caused by accident.

10. Both drivers were unconscious and there was serious bleeding.

11. The crash created a cloud of dust.

12. The trailer being pulled by the pickup was knocked on its side.

13. A door hood or something hit against the window of the Trading Post.

14. Tool box and car battery and a few other small articles were thrown from the vehicle.

15. Pickup hood was up.

16. No skid marks on the part of the defendant.

17. Point of impact in eastbound lane of Highway 26.

18. Skull fractures by both occupants.

The pictures showed that both vehicles, particularly their front ends, were substantially damaged.

The evidence indicated, of course, that defendant's station wagon was traveling rapidly, but there was no proof and no offer to prove that a car traveling at the indicated speed of 55 miles per hour would not have caused all the damage that resulted from this collision. Plaintiff's pickup spun around and stopped near the point of impact. Defendant's vehicle stopped within 50 feet or less from the point of impact. A vehicle traveling 40 miles per hour will strike a stationary object with the same force "as if it had been pushed off the top of a four-story building 54 feet

high." 10 Am Jur Proof of Facts 747. The impact at 55 miles per hour would, of course, be proportionately greater.

The difficulty involved in attempting to estimate speed from the damage to the vehicles and other extrinsic evidence is treated in detail in Lacy's volume on *Scientific Automobile Accident Reconstruction,* from which we quote:

> "The usual sequence of events in a two-car collision consists of braking, with or without skidding, prior to the collision; the impact between the vehicles with an accompanying bending, breaking, and tearing of metal; the act of pushing aside one or more vehicles following the impact; and the final skidding or sliding of the vehicle as it comes to rest. Each of these phases of an accident will use up a portion of the original total energy. By carefully appraising and calculating the energy consumed in each phase, the sum of energy used may be translated into an estimate of the original speed.

> "However, difficulties are encountered in determining the exact quantity of energy used, so that an accurate speed estimation is precluded. The best that can be expected is an estimate of the minimum speed at which the vehicle may have been traveling." Id. at 813.

Repeated mention is made by the author of the probable errors in any estimate of speed based on the movement and condition of the cars after an impact. We quote from page 822 as follows:

> "Most investigators do not have the proper facilities, knowledge, or opportunity to determine the energy consumed from the damage done. To do so would require experimental proof of the force required to bend, rip, tear, and fold every part of the vehicles that sustained damage. An

accomplishment of this type approaches the realm of a major engineering project."

This court recognized the difficulty of estimating speed from vehicle damage in *Cameron v. Goree*, 182 Or 581 at 605, 189 P2d 596 (1948), when it said:

"We know of no method whereby the approximate speed of the appellant's car can be determined from the damage which it caused. The damage, of course, proves that it was traveling rapidly, but it was upon a through way where rapid movement under normal circumstances is lawful. If it were true that all cars traveling at prudent speeds inflict no damage, and that only those proceeding at unlawful rates crush objects which they strike, then the results of this collision would prove negligence. But there is no such rule, and, so far as we know, a car traveling at a careful rate of speed, upon colliding with one which entered an intersection unlawfully, would cause all of the damage which the respondent's witnesses described."

See, also, *Lemons et al v. Holland et al*, 205 Or 163, 284 P2d 1041, 286 P2d 656 (1955); *Rainaud v. Thorne*, 64 NJ Super 271, 165 A2d 785 (1960); *Red Ball Motor Freight, Inc. v. Rockco* (La App 1967) 195 S2d 720.

 We conclude that the jury could not, except by speculation, infer negligence from the evidence of damage to the vehicles and other evidence of a violent impact in this case. In so holding we do not intend to modify the rule that in appropriate cases evidence of damage to vehicles together with other evidence may be received as bearing on the question of speed prior to impact. See, e.g., *State v. Betts*, 235 Or 127, 134, 348 P2d 198, 7 ALR 3d 1445 (1963).

Plaintiff also relies on other evidence to prove that defendant was traveling at an excessive speed.

With regard to stopping at the intersection, plaintiff testified as follows:

"Q All right. Now, then, as you approached the stop sign, what did you do?

"A I stopped and observed both directions and I noticed there was a truck to my right and on the left there was a dip in the road or a blind spot, more or less, and I looked both ways and proceeded into the intersection.

"Q All right. Now, after you proceeded into the intersection, what is your recollection?

"A I don't recall anything after I got in the intersection.

"Q What is the next recollection you have after proceeding into the intersection?

"A I woke up in Gresham Hospital."

Plaintiff testified that when he stopped he was four or five feet north of the stop sign. Plaintiff further testified that the truck to his right was parked on the north shoulder of Highway 26 between the highway and a guardrail. He said the truck was a "delivery, potato chip or a Frito truck," with "an aluminum back end" and was around "nine, ten feet by eight." He said the truck was about 75 feet west of the stop sign, but he located the truck on a scale map at a point thirty feet west of the stop sign.

A state police officer testified that from the intersection the highway to the west was visible for a distance from 800 to 1,000 feet. Plaintiff's testimony concerning the distance he could see the highway to his right was somewhat ambiguous. However, viewing it in the light most favorable to plaintiff, we assume that, in spite of the parked truck, he could see

the highway to his right for a distance of 400 feet. He testified:

> "Q Was it [the parked truck] on the highway or off the highway?
>
> "A It was off the highway. This more or less is a wide shoulder and it was sitting off there.
>
> "Q At any time then, when you were there, what visibility did you have to your right, looking towards Gresham, west?
>
> "A I'd estimate it approximately 400 feet.
>
> "Q Now, when you were at that stop sign, at the moment that you proceeded forward, were there any cars visible to you from that direction?
>
> "A No, sir."

There is no evidence of the speed of plaintiff's pickup as it proceeded into the intersection. No one testified that it started quickly or slowly, how fast it accelerated or how fast it was traveling when it reached the point of impact. Plaintiff's pickup was pulling a trailer on which was mounted a welder, but the effect, if any, of this impediment on the acceleration rate of the pickup is unknown.

If defendant's vehicle was proceeding at the indicated speed of 55 miles per hour it would have traveled 400 feet in about 4.9 seconds. The front of plaintiff's vehicle had to travel about 30 feet to reach the point of impact. If plaintiff's vehicle had attained a speed of 10 miles per hour at the point of impact it would have traveled the 30 feet in 4.6 seconds, including one-half-second perception and reaction time.[1] At an attained speed of seven miles per hour plaintiff's vehicle would have taken 5.5 seconds to travel 30 feet, including one-half-second perception and reaction time.

---

[1] Lacy, *Automobile Accident Cases, Scientific Reconstruction* (1968), pp 1468–1469.

■ Since there is no evidence whatever about the speed of plaintiff's vehicle, its rate of acceleration, or the time elapsing after plaintiff looked to his right before his vehicle started forward, the evidence does not tend to prove an excessive rate of speed on the part of defendant. On the contrary, the evidence tends to prove only that the two vehicles were on a collision course. Under these circumstances we think that a finding of negligence could only be based on speculation. The truck which obstructed plaintiff's vision to his right also prevented defendant from seeing the pickup until it emerged onto the highway. Although defendant was required to maintain a lookout, he was not required to focus his attention on the spot from which plaintiff's vehicle emerged. *Phillips v. Creighton,* 211 Or 645, 316 P2d 302 (1957); *Ginter v. Handy,* 244 Or 449, 452, 419 P2d 21 (1966).

We think the trial court should have granted the defendant's motion for a directed verdict. The judgment is reversed.